# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2020       Decided August 4, 2020

No. 19-1076

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
PETITIONER

v.

UNITED STATES OF AMERICA,
RESPONDENT

———

On Petition for Review from the United States
Court of Military Commission Review

———

*Michel Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for petitioner. With him on the briefs were *Mary McCormick*, *Timothy McCormick*, and *Todd E. Pierce*.

*Eric S. Montalvo* was on the brief for *amici curiae* The Anti-Torture Initiative of the Center for Human Rights & Humanitarian Law at American University Washington College of Law in support of petitioner.

*Joseph Palmer*, Attorney, argued the cause for respondent. With him on the brief were *Steven M. Dunne*, Chief, and *Danielle S. Tarin*, Attorney.

Before: GRIFFITH and RAO, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Ali Hamza Ahmad Suliman Al Bahlul was Osama bin Laden's head of propaganda at the time of the September 11 attacks. After he was captured in Pakistan, Al Bahlul was tried and convicted by a military commission in Guantanamo Bay. Our court subsequently vacated two of his three convictions on *ex post facto* grounds and remanded his case back to the military courts, where his life sentence was reaffirmed. In this most recent appeal, Al Bahlul raises six different statutory and constitutional challenges to his sentence and detention, including three challenges to the appointment of the officer who convened the military commission under the Military Commissions Act of 2006. Only one argument has merit: In reaffirming Al Bahlul's life sentence, the Court of Military Commission Review failed to apply the correct harmless error standard, so we reverse and remand for the court to reassess the sentence. Each of Al Bahlul's remaining arguments lacks merit for the reasons explained below.

I.

Al Bahlul is a Yemeni national who travelled to Afghanistan in the late 1990s to join Al Qaeda. Once there, Al Bahlul pledged an oath of loyalty to Osama bin Laden, underwent military training, and eventually led Al Qaeda's propaganda efforts. Most notably, he created a video for bin Laden in the aftermath of the *U.S.S. Cole* bombing that celebrated the terrorist attack on an American destroyer and called for jihad against the United States. Al Bahlul also served as bin Laden's personal assistant and secretary for public relations. Just before the attacks of September 11, 2001,

Al Bahlul arranged loyalty oaths for two of the hijackers. In the immediate aftermath, he operated the radio used by bin Laden to follow media coverage of the attacks.

Weeks after the September 11 attacks, Al Bahlul fled to Pakistan, where he was captured in December 2001 and turned over to the United States. He was transferred in 2002 to the United States Naval Station at Guantanamo Bay, Cuba, where he has since been detained. This is Al Bahlul's second direct appeal challenging his prosecution under the military commission system established by Congress in the Military Commissions Act of 2006 ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2600.[1] In previous opinions, we have provided a detailed account of his legal actions, so we provide only a brief summary here. *See Al Bahlul v. United States* (*Al Bahlul I*), 767 F.3d 1, 5–8 (D.C. Cir. 2014) (en banc); *Al Bahlul v. United States* (*Al Bahlul III*), 840 F.3d 757, 758 (D.C. Cir. 2016) (per curiam).

Al Bahlul was tried by a military commission convened pursuant to the 2006 MCA. Section 948h of the 2006 MCA provides that "[m]ilitary commissions … may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose." 10 U.S.C. § 948h. In a number of provisions, the 2006 MCA refers

---

[1] Congress amended the 2006 MCA three years later. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, §§ 1801–07, 123 Stat. 2190, 2574–2614 (2009) ("Military Commissions Act of 2009"). Al Bahlul's trial was conducted under the original 2006 MCA. While the statute was for the most part "left … substantively unaltered as relevant" to Al Bahlul's prosecution, *Al Bahlul v. United States* (*Al Bahlul I*), 767 F.3d 1, 6 n.1 (D.C. Cir. 2014), we note explicitly throughout this opinion when citing provisions of the 2006 MCA that were later changed.

to the person designated under Section 948h as "the convening authority." *See, e.g.*, 10 U.S.C. §§ 950b, 950f(c). The 2006 MCA also vests the Convening Authority with significant powers and responsibilities other than convening military commissions. Both the government and Al Bahlul agree that the Convening Authority has the responsibilities of a constitutional "Officer[ ] of the United States" under the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, but they disagree about whether the Convening Authority is properly considered a principal or inferior officer. The Convening Authority's final decision to "approve, disapprove, commute, or suspend [a] sentence" is reviewed by the Court of Military Commission Review ("CMCR"), although the 2006 MCA provides for review "only with respect to matters of law." 10 U.S.C. §§ 950b(c)(2)(C), 950f(d) (2006).

In 2007, the Secretary of Defense designated Susan Crawford as the Convening Authority. Prior to her designation, Crawford was already serving as a Senior Judge of the Court of Appeals for the Armed Forces ("CAAF")[2] as well as an employee serving a three-year term in the Senior Executive Service. Crawford convened a commission to try Al Bahlul of three substantive offenses enumerated in the 2006 MCA: conspiracy to commit war crimes, providing material support for terrorism, and soliciting others to commit war crimes. *See id.* §§ 950u, 950v(b)(25), 950v(b)(28) (2006). The three charges were predicated on largely the same conduct. Al Bahlul refused to participate in the proceedings and instructed his appointed defense counsel to waive objections and to abstain from any motions. Al Bahlul, however, admitted every factual allegation against him but one—an allegation that

---

[2] CAAF reviews the military's intermediate courts. It is the military's highest appellate court.

he once used a suicide belt. Nonetheless, he pleaded not guilty on the grounds that American tribunals lack the authority to try him.

The commission convicted Al Bahlul on all three counts and sentenced him to life in prison. Crawford approved the conviction, and the CMCR affirmed. *See United States v. Al Bahlul*, 820 F. Supp. 2d 1141 (CMCR 2011). A panel of this court then vacated all three convictions on the grounds that the 2006 MCA did not authorize prosecutions based on conduct occurring before 2006 unless the conduct was already prohibited as a war crime and triable by military commission. *See Al Bahlul v. United States*, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).

Sitting en banc, this court upheld Al Bahlul's conviction for conspiracy while vacating the two remaining convictions. *See Al Bahlul I*, 767 F.3d 1. Because Al Bahlul raised no objections at trial, we reviewed his newly raised constitutional objections only for plain error. *See id.* at 8–11. We held that Al Bahlul's *ex post facto* challenge to his conspiracy conviction failed under the plain error standard on two grounds: First, "the conduct for which he was convicted was already criminalized under 18 U.S.C. § 2332(b)," which punishes conspiracies to kill United States nationals; second, "it is not 'plain' that conspiracy was not already triable by law-of-war military commission." *Id.* at 18. After vacating the remaining two convictions under the Ex Post Facto Clause,[3] *id.*

---

[3] We "assume[d] without deciding that the Ex Post Facto Clause applies at Guantanamo" based on the government's concession. *Al Bahlul I*, 767 F.3d at 18. In so doing, we emphasized that we were "not to be understood as remotely intimating in any degree an opinion on the question" of the Clause's extraterritorial application.

at 27–31, the court ordered the case to be remanded, "after panel consideration, … to the CMCR to determine the effect, if any, of the two vacaturs on sentencing." *Id.* at 31.[4]

On remand to the CMCR, Al Bahlul argued for the first time that Crawford's appointment as Convening Authority was unlawful, both on statutory and constitutional grounds. He also argued that intervening Supreme Court precedent required de novo review of his *ex post facto* challenge to the conspiracy conviction. Without remanding to the military commission, the CMCR rejected these arguments on the merits and determined that a life sentence continued to be appropriate, reasoning that the military commission would have imposed the same sentence even if Al Bahlul had been convicted only of conspiracy. *See Al Bahlul v. United States*, 374 F. Supp. 3d 1250 (CMCR 2019). Al Bahlul appealed to this court, and we have exclusive jurisdiction under 10 U.S.C. § 950g.

Al Bahlul raises six discrete arguments on appeal. *First*, he argues that the CMCR applied the wrong harmless error standard in reviewing his sentence on remand by failing to determine beyond a reasonable doubt that the military commission would have imposed the same sentence absent the two convictions vacated by *Al Bahlul I*. *Second*, he claims that

---

*Id.* (quoting *Petite v. United States*, 361 U.S. 529, 531 (1960) (per curiam)).

[4] After *Al Bahlul I*, a panel of this court again vacated the conspiracy conviction, this time concluding Al Bahlul had raised meritorious structural separation of powers objections that could not be forfeited below. *See Al Bahlul v. United States* (*Al Bahlul II*), 792 F.3d 1 (D.C. Cir. 2015). The court once again took Al Bahlul's case en banc, reinstated the conspiracy conviction, and remanded the case to the CMCR. *See Al Bahlul III*, 840 F.3d 757.

Crawford's appointment as the Convening Authority violated the 2006 MCA, which in his view permits the Secretary to designate only individuals who are already officers of the United States at the time of the designation. *Third*, he argues that Crawford's appointment violated the Appointments Clause of the Constitution because the Convening Authority acts as a principal officer who must be appointed by the President with Senate approval. *Fourth*, even if the Convening Authority is an inferior officer, Al Bahlul contends that Crawford's appointment violated the Appointments Clause because Congress did not vest the appointment of the Convening Authority in the Secretary by law. *Fifth*, Al Bahlul argues that recent Supreme Court precedent requires us to reexamine his *ex post facto* challenge to his conspiracy conviction, this time de novo. *Sixth* and finally*,* he raises several challenges to the conditions of his ongoing confinement—namely, that he has allegedly been subjected to indefinite solitary confinement and denied eligibility for parole.

For the reasons discussed below, only Al Bahlul's first argument has merit. In reevaluating Al Bahlul's sentence, the CMCR should have asked whether it was beyond a reasonable doubt that the military commission would have imposed the same sentence for conspiracy alone. We reject Al Bahlul's remaining arguments. Crawford's appointment as the Convening Authority was lawful, there is no reason to unsettle *Al Bahlul I*'s *ex post facto* ruling, and we lack jurisdiction in an appeal from the CMCR to entertain challenges to the conditions of Al Bahlul's ongoing confinement. We therefore affirm in part, reverse in part, and dismiss Al Bahlul's petition in part for lack of jurisdiction. We remand for reconsideration of the sentence under the correct standard.

II.

We start with Al Bahlul's sole meritorious claim. Al Bahlul argues that the CMCR erred by reassessing his sentence without remand to the military commission and, further, by misapplying the harmless error doctrine in maintaining his life sentence. In *Al Bahlul I*, the en banc court directed the CMCR to "determine the effect, if any, of the two" vacated convictions on Al Bahlul's sentence. 767 F.3d at 31. While we conclude that the CMCR had the discretion to reassess the sentence without remanding to the military commission, we agree that the CMCR erred by reaffirming Al Bahlul's life sentence without first determining that the constitutional errors were harmless beyond a reasonable doubt.

As an initial matter, the CMCR correctly determined that it had the authority to assess Al Bahlul's sentence without remand. In the analogous court-martial context governed by the Uniform Code of Military Justice ("UCMJ"), intermediate military appellate courts may in some circumstances revise sentences without remand to the court-marital. *See Jackson v. Taylor*, 353 U.S. 569, 579–80 (1957). In *United States v. Winckelmann*, CAAF held that intermediate military courts should consider four factors in determining whether to reassess a sentence without remand: (1) whether the defendant was tried by military judges; (2) whether there are "dramatic changes" in the penalty the defendant is exposed to; (3) whether "the nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses"; and (4) whether "the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." 73 M.J. 11, 15–16 (CAAF 2013).

In light of the parallels in text and structure, we have previously relied on the UCMJ to inform our interpretation of the statutes governing military commissions. *See In re Al Nashiri*, 835 F.3d 110, 122–23 (D.C. Cir. 2016). Here, we conclude that the CMCR did not err when it applied the *Winckelmann* factors in concluding it was appropriate to evaluate the sentence without remanding to a military commission. In the court-martial context, a military court has discretion under *Winckelmann* to reevaluate a sentence without remand, and we have held that the military should not be held to higher procedural standards in the context of military commissions than it would in the court-martial context. *Id.* To the contrary, if a "procedure for courts-martial is considered adequate to protect defendants' rights, the same should be true of the review procedure for military commissions." *Id.* at 123.

Whether to remand for reconsideration of a sentence is left to the military court's discretion, so we review the CMCR's decision only for abuse of discretion. *See Winckelmann*, 73 M.J. at 12. The CMCR properly applied the *Winckelmann* factors, and it was not an abuse of discretion to reevaluate Al Bahlul's sentence without remand to the military commission. After we vacated two of his convictions, Al Bahlul remained subject to the same maximum sentence—life in prison—and the one remaining conviction for conspiracy was predicated on the same conduct as the two that were vacated. Moreover, as the CMCR noted, "conspiracy to commit murder is not so novel a crime that" the intermediate court would be "unable to 'reliably determine what sentence would have been imposed at trial'" with respect to Al Bahlul's similar crime of conspiracy to commit war crimes, including the murder of noncombatants. *Al Bahlul*, 374 F. Supp. 3d at 1273 (quoting *Winckelmann*, 73 M.J. at 16).

In reevaluating Al Bahlul's sentence, however, the CMCR applied the wrong legal standard. When an intermediate military court "reassesses a sentence because of a prejudicial error, its task differs from that which it performs in the ordinary review of a case." *United States v. Sales*, 22 M.J. 305, 307 (CMA 1986). To "purge[ ]" the sentence "of prejudicial error," the new sentence should be less than or equal to the sentence that would have been delivered by the trier of fact "absent any error." *Id.* at 308. Here, the CMCR concluded that the original life sentence remained appropriate because any constitutional error in Al Bahlul's original sentence was harmless. Yet the CMCR misapplied well-established harmless error principles.

In ordinary criminal proceedings, an error may be found harmless if the court determines it had no "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Whitmore*, 359 F.3d 609, 622 (D.C. Cir. 2004) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Yet "before a federal *constitutional* error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967) (emphasis added). The military courts have adopted the same standard in the court-martial context for reviewing whether a constitutional error was harmless, *see Sales*, 22 M.J. at 307–08 (concluding that in cases of constitutional error "the Court of Military Review should be persuaded beyond a reasonable doubt that its reassessment has rendered harmless any error affecting the sentence adjudged at trial"), and the government concedes that the same standard should apply in the military commission context, Gov't Br. 28. We agree. In both the court-martial context and in civilian criminal proceedings, a constitutional error is considered harmless only if found to be harmless beyond a reasonable doubt. As all parties agree, military commissions should be

subject to the same harmless error standard that is uniformly applied in other criminal contexts in cases involving constitutional errors.

The CMCR purported to rely on the standard articulated by the Court of Military Appeals in *Sales* but erred in the application of the standard. The CMCR maintained that it could reaffirm the original sentence because the court was "confident that, absent the error, the [military commission] would have sentenced the appellant to confinement for life." *Id.* at 1273. Yet nowhere did the court explicitly address whether the errors were harmless beyond a reasonable doubt. Because the errors identified by *Al Bahlul I* were constitutional *ex post facto* violations, the CMCR applied the wrong harmless error standard and therefore abused its discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (holding that it is necessarily an abuse of discretion to apply the wrong legal standard). We therefore reverse and remand for the CMCR to redetermine "the effect, if any, of the two vacaturs on sentencing." *Al Bahlul I*, 767 F.3d at 31. Under the harmless error standard the government concedes applies, the CMCR must determine the constitutional errors were harmless beyond a reasonable doubt.

III.

Next, Al Bahlul argues that Crawford's appointment by the Secretary as Convening Authority was unlawful on three grounds. First, he maintains that the 2006 MCA permits the Secretary to select only individuals who are already serving as officers of the United States. Alternatively, he argues that the Convening Authority acts as a principal officer, thus requiring presidential appointment after Senate confirmation. Finally, Al Bahlul argues that even if the Convening Authority is an

inferior officer, Crawford's appointment by the Secretary violated the Appointments Clause, because the 2006 MCA did not vest the Secretary with the power to appoint an inferior officer.

Al Bahlul's challenges require us to interpret both the Constitution's Appointments Clause and the 2006 MCA. The Appointments Clause provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2. Courts have long referred to officers who must be appointed by the President with Senate confirmation as "principal officers." *See, e.g.*, *United States v. Germaine*, 99 U.S. 508, 509–11 (1878). The statute establishing the Convening Authority, Section 948h of the 2006 MCA, provides that "[m]ilitary commissions … may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose." 10 U.S.C. § 948h. The Convening Authority has significant authority, including wide discretion to review a military commission's findings and sentences. *See* 10 U.S.C. § 950b(c)(2)(C) (2006) ("[T]he convening authority may, in

his sole discretion, approve, disapprove, commute, or suspend the sentence in whole or in part.").

Crawford's appointment was entirely consistent with both the Constitution and the 2006 MCA: Section 948h allows the Secretary to select any official of the United States to serve as the Convening Authority, including mere employees. Moreover, the Convening Authority is an inferior officer. Because the 2006 MCA vests the Secretary with the power to appoint inferior officers by law, Crawford's appointment was constitutional.

## A.

Al Bahlul argues that Crawford's appointment as Convening Authority violated the 2006 MCA because the Secretary may designate only an "officer or official of the United States." 10 U.S.C. § 948h. According to Al Bahlul, the term "officer" refers only to military officers, while the term "official" refers to civilian officers. Either way, he contends the Convening Authority must be a person who is already a principal or inferior officer appointed through the procedures prescribed by the Appointments Clause. Al Bahlul argues that Crawford's appointment was therefore unlawful because she was only an employee at the time of her designation. In the government's view, the 2006 MCA's reference to "officer" includes all officers of the United States in the constitutional sense, both military and civilian, while the term "official" refers broadly to other government employees. The MCA thus allows the Secretary to select an employee to serve as Convening Authority. The government has the better reading of the statute. The term "official" includes government employees who are not "Officers of the United States" in the constitutional sense. Even assuming Crawford was only an

employee at the time of her appointment, a question we do not decide,[5] her designation was consistent with the requirements of the 2006 MCA.

The 2006 MCA permits the Secretary to designate either officers or officials of the United States as the Convening Authority. Against the Appointments Clause background and in light of the text and structure of the MCA, "official" cannot be read to mean "civilian officer." In the constitutional context, an "officer" is someone who "occup[ies] a continuing position established by law" and who "exercis[es] significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quotation marks omitted). An "official," on the other hand, can be an employee with less responsibility. *See Lucia*, 138 S. Ct. at 2050 (referring to "mere employees" as "officials with lesser responsibilities who fall outside the Appointments Clause's ambit"). Congress regularly uses the word "official," a term that extends beyond officers in

---

[5] The parties dispute the significance of the fact that Crawford was already serving as a senior judge of CAAF. The government contends that her status as a senior judge made her a principal officer, which would cure several of the problems alleged by Al Bahlul. *See* Gov't Br. 47–50. Judges of CAAF are appointed by the President with Senate confirmation; however, "[a] senior judge shall be considered to be an officer or employee of the United States … only during periods the senior judge is performing duties [as senior judge.]" 10 U.S.C. § 942(e)(4). Because we conclude that Crawford's appointment was lawful on both statutory and constitutional grounds regardless of whether she was already a principal or inferior officer of the United States, we need not address the significance of her status as a senior judge of CAAF.

the constitutional sense, to refer broadly to government employees.[6]

By contrast, and consistent with the constitutional background, Congress generally uses the word "officer" to refer to principal and inferior officers who must be appointed in accordance with the Appointments Clause. *See Steele v. United States*, 267 U.S. 505, 507 (1925) (explaining that it is usually "true that the words 'officer of the United States,' when employed in … statutes … have the limited constitutional meaning"). The 2006 MCA is no exception. The statute refers throughout to military officers by using explicit language like "commissioned officer of the armed forces." *See, e.g.,* 10

---

[6] For example, in a provision of the Military Commissions Act of 2009 governing access to classified information, the government must submit a declaration signed by any "knowledgeable United States official possessing authority to classify information." 10 U.S.C. § 949p-4(a)(1). The statute does not limit the term "official" to officers of the United States, and employees can possess the authority to classify information. Similarly, in a statute governing "military custody for foreign Al-Qaeda terrorists," Congress provided that certain procedures do "not apply when intelligence, law enforcement, or other Government officials of the United States are granted access to an individual who remains in the custody of a third country"—again suggesting that the term "official" applies broadly to those who work for the United States government. National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1022, 125 Stat. 1298, 1564 (2011). This consistent usage extends to other parts of the United States Code as well. For instance, in a provision punishing the bribery of public officials, the term "public official" includes "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government … in any official function." 18 U.S.C. § 201(a)(1).

U.S.C. § 948i(a) (2006) ("Any commissioned officer of the armed forces on active duty is eligible to serve on a military commission."); *id.* § 948j(b) ("A military judge shall be a commissioned officer of the armed forces."); *id.* § 949b(b) (prohibiting the consideration of military commission performance when "determining whether a commissioned officer of the armed forces is qualified to be advanced in grade"). Rather than use the military officer language found elsewhere in the 2006 MCA, Section 948h uses the more generic "officer … of the United States," without qualification. This language mirrors the text of the Constitution's Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, which is a strong indication that "officer … of the United States" refers to all officers in the constitutional sense, not just military officers. *See Steele*, 267 U.S. at 507; *United States v. Mouat*, 124 U.S. 303, 307 (1888).

Contrary to this plain meaning, Al Bahlul maintains that "officer or official of the United States" includes only officers in the constitutional sense. Yet this interpretation reads the word "official" out of the statute. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). Al Bahlul attempts to sidestep the surplusage problem by limiting "officer" to military officers and "official" to civilian officers. Yet nothing in the 2006 MCA suggests that Congress used "official" in an unorthodox sense meaning constitutional "officer." Similarly, there is no indication that "officer" means exclusively *military* officers in Section 948h. To the contrary, the statute explicitly refers to military officers in other provisions as "commissioned officer[s] of the armed forces." 10 U.S.C. §§ 948i(a), 948j(b), 949b(b) (2006). We decline to limit Section 948h's use of the general term "officer" only to military officers, a conclusion

inconsistent with other provisions of the 2006 MCA as well as the ordinary constitutional meaning of "officer … of the United States."

Al Bahlul next cites 10 U.S.C. § 101(b)(1), which states that "'officer' means a commissioned or warrant officer" in Title 10 of the United States Code. This particular definition of "officer," however, appears in Section 101(b)'s list of definitions specifically "relating to military personnel," not in Section 101(a)'s general list of definitions, which apply to Title 10 without qualification. In other words, the specialized definition found in Section 101(b)(1) would apply only if we first assumed what Al Bahlul is trying to prove—that "officer" in Section 948h refers only to military personnel. Nothing in the text of Section 948h suggests that it refers specifically to military personnel, so the military personnel definition in Section 101(b)(1) is of little use. Moreover, Section 101(b)(1) was not enacted as part of the 2006 MCA; it was enacted over four decades earlier as part of a general definitional statute. *See* Pub. L. No. 87-649, 76 Stat. 451, 452 (1962). General definitional statutes are more easily defeasible by context than definitions found in the same statute as the language at issue. *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 279–80 (2012) ("[A] legislature has no power to dictate the language that later statutes must employ. … [W]hen the definition set forth in an earlier statute provides a meaning that the word would not otherwise bear, it should be ineffective.").

Here, the text is unambiguous: The Secretary may designate either an officer or an official of the United States, and the term official includes individuals who were mere employees prior to their designation. Thus, irrespective of

whether Crawford was already an officer, her appointment as the Convening Authority did not violate the 2006 MCA.

B.

In addition to his statutory challenge to Crawford's appointment, Al Bahlul raises two constitutional challenges under the Appointments Clause. We start with his argument that Crawford's appointment by the Secretary was unconstitutional because the Convening Authority acts as a principal officer and therefore must be appointed by the President with Senate confirmation. Because other executive officers directed and supervised the Convening Authority's work, we hold that Crawford was an inferior officer and was therefore properly appointed by the Secretary.

Both the government and Al Bahlul agree that Crawford acted as an officer of the United States for purposes of the Appointments Clause. The parties dispute only whether she acted as a principal or inferior officer. The Supreme Court addressed the distinction between principal and inferior officers most directly in *Edmond v. United States*, 520 U.S. 651 (1997). The Court explained that "the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior officer' depends on whether he has a superior." *Id.* at 662. More specifically, "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 663; *see also NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 947 (2017) (Thomas, J., concurring) ("[A] principal officer is one who has no superior other than the President."). Whether an officer is principal or inferior is a "highly contextual" inquiry requiring a close examination of

the specific statutory framework in question. *In re Al-Nashiri*, 791 F.3d 71, 84 (D.C. Cir. 2015).

In order to determine whether an officer is inferior because he is supervised by a principal officer, our court looks to three factors drawn from *Edmond*: whether there is a sufficient "degree of oversight," whether the officer has "final decision-making authority," and the extent of the officer's "removability." *In re Grand Jury Investigation*, 916 F.3d 1047, 1052 (D.C. Cir. 2019). Each of the three factors identified by *Edmond* and our subsequent cases indicates that the Convening Authority is an inferior officer. The Convening Authority's decisions are not final and are subject to review by the CMCR; the Secretary maintains additional oversight by promulgating rules and procedures; and the Convening Authority is removable at will by the Secretary.

First, the bulk of the Convening Authority's decisions are not final. Instead, they are subject to review by the CMCR. *See* 10 U.S.C. § 950f (2006). To be sure, the CMCR's review was limited to questions of law under the 2006 MCA, *id.* § 950f(d), but the same was true in *Edmond*, which held that the judges of the Coast Guard Court of Criminal Appeals were inferior officers even though CAAF can review their factual findings only to determine whether the evidence underlying a conviction is sufficient as a matter of law. *See* 520 U.S. at 665 (noting that CAAF "will not reevaluate the facts" unless there is no "competent evidence in the record to establish each element of the offense beyond a reasonable doubt"); *United States v. Leak*, 61 M.J. 234, 239 (C.A.A.F. 2005) ("[T]his Court's review is limited to questions of law."). Despite that limitation, *Edmond* concluded that the degree of oversight was sufficient to render judges of the Court of Criminal Appeals inferior officers for Appointments Clause purposes. *Id.* at 665–

66 (explaining that the narrow scope of the review did not "render the judges of the Court of Criminal Appeals principal officers. What is significant is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers.").

Similarly, in *Intercollegiate Broadcasting System, Inc, v. Copyright Royalty Board*, we determined that Copyright Royalty Judges were inferior officers, even though direct review of the Judges' factual findings was also severely limited. 684 F.3d 1332, 1339 (D.C. Cir. 2012) ("[T]he Register's power to control the [Judges'] resolution of pure issues of law plainly leaves vast discretion over the rates and terms."). Nonetheless, after our court severed the Judges' removal protections, we determined that they were inferior officers. *Id.* 1341–42 ("Although individual … decisions will still not be directly reversible, the Librarian would be free to provide substantive input on non-factual issues. … This, coupled with the threat of removal satisfies us that the [Copyright Royalty Judges'] decisions will be constrained to a significant degree by a principal officer (the Librarian)."). The power to review even pure legal determinations is "is a non-trivial limit on" an officer's decisionmaking such that an officer may be deemed an "inferior" officer for purposes of the Appointments Clause. *Id.* at 1339.

Al Bahlul emphasizes that the CMCR is unable to review several of the Convening Authority's consequential powers. Most importantly, the Convening Authority has the power to modify charges, overturn a verdict, or commute a sentence, all of which are effectively unreviewable. *See* 10 U.S.C. § 950b(c)(2)(C) (2006) ("[T]he convening authority may, in his sole discretion, approve, disapprove, commute, or suspend

the sentence in whole or in part."). Once again, *Edmond* is closely analogous: The judges of the Court of Criminal Appeals have the power to "independently weigh the evidence" without "defer[ence] to the trial court's factual findings." *See* 520 U.S. at 662 (quotation marks omitted). If they decide to reverse the factual findings underlying a conviction, thus overturning the verdict, CAAF has no power to reverse that decision unless the evidence was insufficient as a matter of law. *See id.* at 665; *Leak*, 61 M.J. at 239. Although the Convening Authority may make some final decisions, that authority is consistent, as in *Edmond*, with being an inferior officer. *See Edmond*, 520 U.S. at 662 (emphasizing that the significance of the authority exercised by an officer does not necessarily determine whether he is principal or inferior, because all constitutional officers "exercis[e] significant authority on behalf of the United States").

Second, the Secretary maintains a degree of oversight and control over the Convening Authority's work through policies and regulations. The Secretary has the power to prescribe procedures and rules of evidence governing military commissions, including rules governing "post-trial procedures." 10 U.S.C. § 949a(a). The Secretary has exercised that authority to regulate and to oversee the conduct of the Convening Authority in detailed ways. *See, e.g.*, R.M.C. 104(a)(1) (2007) (prohibiting the Convening Authority from censuring, reprimanding, or admonishing the military commission, its members, or the military judge); R.M.C. 407 (2007) (prescribing rules for the forwarding and disposition of charges); R.M.C. 601(f) (2007) ("The Secretary of Defense may cause charges, whether or not referred, to be transmitted to him for further consideration, including, if appropriate, referral."); *see also In re Grand Jury*, 916 F.3d at 1052 (concluding that special counsel Robert Mueller was an inferior

officer because the Attorney General "has authority to rescind at any time the Office of Special Counsel regulations"). While the Secretary's power to define rules of evidence and other procedures does not by itself make the Convening Authority an inferior officer, it provides further evidence that the Convening Authority's work is directed by the Secretary and subject to his supervision.

Finally, the Convening Authority is removable at will by the Secretary. The 2006 MCA includes no explicit tenure provisions, and "[t]he long-standing rule relating to the removal power is that, in the face of congressional silence, the power of removal is incident to the power of appointment." *Kalaris v. Donovan*, 697 F.2d 376, 401 (D.C. Cir. 1983); *see also* Oral Argument at 14:25 (Al Bahlul's counsel conceding that "there's no tenure protection" for the Convening Authority). As the Supreme Court concluded in *Edmond*, the "power to remove officers … is a powerful tool for control." *Edmond*, 520 U.S. at 664.

Al Bahlul argues that the power to remove means little here because the Convening Authority's "'judicial acts' are statutorily insulated from" the Secretary's interference. Reply Br. 16. The 2006 MCA provides that "[n]o person may attempt to coerce or, by any unauthorized means, influence … the action of any convening, approving, or reviewing authority with respect to his judicial acts." *See* 10 U.S.C. § 949b(a)(2)(B) (2006). Yet such insulation was also present in *Edmond*: The judges of the Court of Criminal Appeals are removable at will only by the Judge Advocate General, who is prohibited from "influenc[ing] (by threat of removal or otherwise) the outcome of individual proceedings." 520 U.S. at 664 (citing UCMJ Art. 37, 10 U.S.C. § 837). In other words, the judicial acts of the Court of Criminal Appeals, like the judicial acts of the

Convening Authority, have some statutory insulation from interference by the person holding the removal power. The removal power was nonetheless an important factor in *Edmond* in determining that the Court of Criminal Appeals judges are inferior officers. Similarly, we held in *Intercollegiate* that removal at will is a powerful tool for control even when direct review is limited. *See* 684 F.3d at 1340–41 (severing removal restrictions was sufficient to make Copyright Royalty Judges inferior officers); *see also In re Grand Jury*, 916 F.3d at 1052–53 (holding that special counsel Robert Mueller was an inferior officer in part because he "effectively serve[d] at the pleasure of an Executive Branch officer" and because the "control thereby maintained" ensured a meaningful degree of oversight).

*Edmond* requires that inferior officers have "some level" of direction and supervision by a principal officer, 520 U.S. at 663, not necessarily total control. Even inferior officers exercise discretion and important duties established by law. The Appointments Clause allows the appointment of such officers to be vested in a Head of Department so long as the proper chain of command is maintained. *See* 1 Annals of Cong. 499 (1789) (statement of James Madison) (explaining that the President may rely primarily on subordinates because "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President," establishing a "chain of dependence"). Here, the factors identified by the Supreme Court in *Edmond* establish that the Convening Authority is an inferior officer. As an inferior officer, Crawford's appointment by the Secretary was perfectly consistent with the Appointments Clause.

C.

Even if the Convening Authority is an inferior officer, Al Bahlul argues that Crawford's appointment violated the Appointments Clause because Section 948h does not vest the Secretary with the power to appoint an inferior officer. Al Bahlul Br. 28–34. According to Al Bahlul, Section 948h does no more than describe a duty that can be delegated to existing constitutional officers. He also argues that the 2006 MCA does not create "a freestanding office" to which an inferior officer *could* be appointed. *Id.* Contrary to Al Bahlul's characterizations, the 2006 MCA's conferral of the power to designate the Convening Authority was sufficient to vest the Secretary with the constitutional power to appoint an inferior officer.

Article II of the Constitution grants Congress broad power to "vest the Appointment of … inferior Officers" in "the Heads of Departments." U.S. CONST., art. II, § 2, cl. 2. Whether to exercise this power is explicitly left to Congress's discretion, to be done "as they think proper." *Id.* This power is reinforced by Article I, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution … Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." *Id.*, art. I, § 8, cl. 18. Thus, "Congress has plenary control over the … existence of executive offices." *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 500 (2010); *see also Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation.").

Consistent with the Constitution's requirement that Congress vest the power to appoint an officer "by law," statutes "repeatedly and consistently distinguish[ ] between an office that would require a separate appointment and a position or duty to which one [can] be 'assigned' or 'detailed' by a superior." *Weiss v. United States*, 510 U.S. 163, 172 (1994). While the explicit use of the term "appoint" may "suggest[ ]" whether a statute vests the appointment power, *Edmond*, 520 U.S. at 658, our court has held that Congress need not use explicit language to vest an appointment in someone other than the President. *See In re Grand Jury*, 916 F.3d at 1053–54; *In re Sealed Case*, 829 F.2d 50, 55 (D.C. Cir. 1987). Thus, reading the statute as a whole, we consider whether Congress in fact authorized a department head to appoint an inferior officer. *Cf. In re Sealed Case*, 829 F.2d at 55 (reading the statute as a whole and determining it "accommodat[ed] the delegation" of responsibilities by the Attorney General to a special counsel). Two features of the 2006 MCA suggest that Congress exercised its broad power to vest the appointment of the Convening Authority in the Secretary. First, after establishing and defining the office of the Convening Authority in considerable detail, Section 948h specifically provides that the Secretary will choose the person to fill that office. Second, because the text and structure of the statute are readily interpreted as a lawful exercise of Congress's power to vest the appointment power in a department head, we decline to adopt an interpretation that would render the provision unconstitutional.

The text and structure of the 2006 MCA show that Congress established a new office—the Convening Authority—and tasked the Secretary with selecting the person to fill that office. By referring to the Convening Authority by name and using the definite article "the," several sections of the

2006 MCA strongly suggest that the Convening Authority is a distinct office and not simply a duty to be performed by existing officers. *See, e.g.*, 10 U.S.C. § 948i(b) (2006) ("[T]he convening authority shall detail as members of the commission such members … [who] in the opinion of the convening authority, are best qualified for the duty."); *see also id.* § 950b(a); *id.* § 950b(b); § 948*l*(a). The text of the 2006 MCA is in stark contrast to the UCMJ, which specifically lists existing officers who are permitted to perform the function of convening courts-martial. *See* 10 U.S.C. § 822. The 2006 MCA, on the other hand, grants the Secretary the power to designate any officer or official to be "the convening authority," a new office created by the statute. Section 948h authorizes the Secretary to designate the person who will occupy that office. Because no magic words are required to grant a department head the power to appoint an inferior officer, this designation is sufficient for the power to be vested "by law."

Al Bahlul's reading not only runs contrary to the ordinary meaning of the statute, but would unnecessarily raise serious constitutional concerns. We decline to read the 2006 MCA in a manner that would render Crawford's appointment unconstitutional when another interpretation is readily available. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) ("[A] statute is to be construed where fairly possible so as to avoid substantial constitutional questions."). As discussed above, the 2006 MCA unambiguously permits the Secretary to designate as the Convening Authority an individual who, at the time of the designation, was a mere employee. Both parties agree, however, that the Convening Authority exercises the type of significant responsibilities that properly belong to an officer of the United States. Thus, if Section 948h does not vest in the Secretary the power to

appoint an inferior officer, then the statute permits an employee to exercise the duties of an officer of the United States without a constitutional appointment. Nothing in the text or structure of the statute requires us to interpret it in this way, which flies in the face of the plain meaning and would raise significant constitutional doubts. Al Bahlul's final challenge to Crawford's appointment therefore fails.

Reading the statute as a whole, we conclude that in Section 948h Congress exercised its broad power under the Appointments and Necessary and Proper Clauses to create an office of the Convening Authority and to vest the power to appoint this inferior officer in the Secretary. Thus, Crawford's appointment satisfied the requirements of the Constitution as well as the 2006 MCA.

IV.

Next, Al Bahlul asks the court to reconsider his *ex post facto* challenge to his conspiracy conviction, a challenge we reviewed for plain error in *Al Bahlul I* because it was forfeited below. *See* 767 F.3d at 18–27. The law-of-the-case doctrine dictates that "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis omitted). The doctrine bars re-litigation "in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). We may reconsider a prior ruling in the same litigation if there has been "an intervening change in the law." *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999). None of these limited circumstances are present here and therefore we cannot reconsider our forfeiture ruling in *Al Bahlul I*.

According to Al Bahlul, the Supreme Court's decision in *Class v. United States* fundamentally changed the law of forfeiture and plain error review. *See* 138 S. Ct. 798 (2018). But *Class*'s holding was relatively narrow. The Supreme Court held that a criminal defendant who pleads guilty does not necessarily waive challenges to the constitutionality of the statute under which he is convicted. *Id.* at 803–05. The Court did not, however, hold that such claims are not waivable at all: The Court addressed only whether a guilty plea constitutes a waiver "by itself." *Id.* at 803; *see also id.* at 805 (concluding that a "guilty plea does not bar a direct appeal *in these circumstances*") (emphasis added). The Court twice emphasized that Class had not waived his objections through conduct other than his guilty plea, *see id.* at 802, 807, thus making clear that the Court was addressing only the effect of pleading guilty. Al Bahlul did not plead guilty, so *Class* is irrelevant to this case.

Moreover, because *Class* addressed only waiver, it did not diminish our holding in *Al Bahlul I*, which involved forfeiture. *See* 767 F.3d at 10. "Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *United States v. Miller*, 890 F.3d 317, 326 (D.C. Cir. 2018) (quotation marks and alterations omitted). After *Class*, two of our sister circuits have held that constitutional claims should be reviewed only for plain error if a criminal defendant forfeits his claims before the district court. *See United States v. Rios-Rivera*, 913 F.3d 38, 42 (1st Cir. 2019); *United States v. Bacon*, 884 F.3d 605, 610–11 (6th Cir. 2018). Those decisions are consistent with the "familiar" principle "that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right." *Peretz v. United States*, 501 U.S. 923, 936–37 (1991). Al Bahlul "flatly refused to participate in the

military commission proceedings and instructed his trial counsel not to present a substantive defense." *Al Bahlul I*, 767 F.3d at 10. This forfeiture made it appropriate for our court to review his *ex post facto* defense for plain error.

Taking a slightly different approach, Al Bahlul argues that even if a challenge to the constitutionality of the statute of conviction would be subject to forfeiture in the Article III context, it cannot be forfeited in the military context, where any fundamental defect in the document charging the accused with a crime deprives the military court of jurisdiction. Al Bahlul Br. 37–39 (citing *United States v. Ryan*, 5 M.J. 97, 101 (CMA 1978)). Even assuming *arguendo* that Al Bahlul has accurately characterized jurisdictional rules in the military context, he fails to identify an intervening change in the law that would support overturning *Al Bahlul I*: An *ex post facto* violation has been a constitutional defect since the Constitution's ratification, and every source Al Bahlul cites for the proposition that military courts view jurisdiction differently predates *Al Bahlul I. See id.*

Finally, Al Bahlul argues that we should reconsider the en banc decision because the Department of Defense has purportedly changed its position on a material legal question. In *Al Bahlul I*, our court held that it was "not obvious" for the purposes of plain error review "that conspiracy was not traditionally triable by law-of-war military commission." 767 F.3d at 27. Al Bahlul contends that the Department of Defense has since taken a position that is inconsistent with this court's conclusion, albeit in non-binding materials such as the Law of War Manual. Al Bahlul Br. 40–42; *see also* Department of Defense, Law of War Manual § 1.1.1 (2015) ("This manual is not intended to, and does not, create any right … enforceable at law or in equity against the United States."). Al Bahlul offers

no support for the notion that a party's change of position—in this case, one gleaned from non-binding internal documents—is one of the extraordinary circumstances warranting reconsideration of a court's holding under the law-of-the-case doctrine.[7]

Furthermore, we rejected this *ex post facto* challenge in *Al Bahlul I* "for two independent and alternative reasons." 767 F.3d at 18. Al Bahlul contends that the government changed its position on whether conspiracy was previously triable by military commissions under the law of war, but his argument does not undermine this court's alternative holding that "the conduct for which he was convicted was already criminalized under 18 U.S.C. § 2332(b)," *id.*, which punishes conspiracies to kill United States nationals.

Because Al Bahlul has failed to identify an intervening change of law or any other extraordinary circumstance, we decline to revisit the en banc court's treatment of his *ex post facto* challenge to his conspiracy conviction.

## V.

Finally, Al Bahlul argues that the manner in which the government is executing his sentence is unlawful. Specifically, he claims that the government has unlawfully subjected him to

---

[7] In any event, the Department of Defense maintains that it has not changed its position on whether conspiracy was historically triable by military commission, which is supported by the Law of War Manual. *See* Law of War Manual § 18.23.5 (stating that "[t]he United States has taken the position that conspiracy to violate the law of war is punishable" and that "[t]he United States has" historically "used military tribunals to punish unprivileged belligerents for the offense of conspiracy to violate the law of war").

indefinite solitary confinement and that the government's current policies wrongfully bar him from parole consideration. Al Bahlul's challenges to the ongoing status of his confinement are outside our jurisdiction on direct appeal, which is limited to "determin[ing] the validity of a final judgment rendered by a military commission." 10 U.S.C. § 950g(a). We "may act … only with respect to the findings and sentence as approved by the convening authority and as affirmed or as set aside as incorrect in law by the [CMCR]." *Id.* § 950g(d). Because we have jurisdiction in this posture only to review the validity of the sentence, and because we may act only with respect to actions taken by the Convening Authority and the CMCR, Al Bahlul must bring any challenges to the conditions of his confinement through a different mechanism—likely a petition for a writ of habeas corpus. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).[8]

In response, Al Bahlul emphasizes that CAAF has interpreted its analogous jurisdictional provision to permit consideration on direct review of whether the "approved sentence is being executed in a manner that offends the Eighth Amendment." *United States v. White*, 54 M.J. 469, 472 (CAAF 2001). We recognize that "military courts are capable of, and indeed may have superior expertise in, considering challenges to their jurisdiction over disciplinary proceedings." *New v. Cohen*, 129 F.3d 639, 645 (D.C. Cir. 1997). Yet we always have an independent obligation to determine whether our court's jurisdiction is proper. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006). While we sometimes rely on parallels between the UCMJ and the 2006 MCA, an Article III court cannot assume jurisdiction by analogy to an Article II court's

---

[8] Because this court lacks jurisdiction, we express no opinion on the procedural or substantive merits of such a challenge.

interpretation of a different statute. The MCA permits us to act "only with respect to the findings and sentence as approved by the convening authority," 10 U.S.C. § 950g(d), and therefore we lack jurisdiction to hear Al Bahlul's challenges to the conditions of his ongoing confinement.

* * *

For foregoing reasons, we affirm in part, reverse in part, and dismiss Al Bahlul's petition in part for lack of jurisdiction. We remand for the CMCR to reevaluate Al Bahlul's life sentence under the correct harmless error standards, but we reject Al Bahlul's remaining challenges.

*So ordered.*