**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**May 22, 2025**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CRAIG GORDON,

    Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RONALD DARNELL BROWN,

    Defendant - Appellant.

No. 23-4094

No. 23-4151

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:22-CR-00308-DS-1)**
**(D.C. No. 2:22-CR-00239-JNP-1)**

_____

Scott Keith Wilson, Federal Public Defender, Office of the Federal Public Defender, Salt Lake City, Utah, for Defendants-Appellants.

Nathan H. Jack, Assistant United States Attorney (Trina A. Higgins, United States Attorney, with him on the briefs), Office of the United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **HARTZ**, **KELLY**, and **ROSSMAN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Federal law prohibits possession of a firearm by someone "subject to a court order that . . . by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against [an] intimate partner or child." 18 U.S.C. § 922(g)(8)(C)(ii) ("(C)(ii)"). Defendants Craig Gordon and Ronald Darnell Brown were each indicted for possession of a firearm while subject to such an order. They argue that (C)(ii) violates on its face the Second Amendment to the United States Constitution. We disagree. Because there are at least some circumstances in which (C)(ii) can be constitutionally applied to a defendant's conduct, it is not facially unconstitutional.

## I.    BACKGROUND

### A.    Factual Background

The following facts have not been disputed by the parties.

#### 1.    *Gordon*

Mr. Gordon sent his ex-partner, M.W., text messages threatening to hurt or kill her if he did not get to see his daughter. He then showed up at her house, grabbed his daughter, and held her so tightly that it caused her to suffer minor injuries. M.W. petitioned a Utah state court for a protective order. After a hearing on May 4, 2022, at which Mr. Gordon was present electronically, he stipulated to a protective order.

2

The order "by its terms explicitly prohibited the use, attempted use, or threatened use of physical force against an intimate partner." Gordon R., Vol. I at 15. It also barred Mr. Gordon from "possess[ing] any guns or firearms." *Id.* at 17.

On June 9, 2022, law-enforcement officers discovered a Springfield Armory Hellcat 9mm and ammunition in Mr. Gordon's car.

### 2.     *Brown*

On March 28, 2021, Mr. Brown violently attacked T.G., his live-in girlfriend. Police were called and he was charged with multiple offenses, including assault against a police officer and domestic violence in the presence of a child. On April 22, 2021, T.G. petitioned a Utah state court for a protective order against Mr. Brown. After notice to Mr. Brown, he and his counsel attended a hearing at which the court entered a protective order and served it on him. The order declared, "No guns or firearms!" (citing § 922(g)(8)), and required him not to "commit, try to commit, or threaten to commit any form of violence against [T.G.]"—including "stalking, harassing, threatening, [or] physically hurting" her. Brown R., Vol. I at 26 (internal quotation marks omitted).[1]

---

[1] Although Mr. Gordon has admitted that the state-court post-hearing order forbade him from possessing a gun or firearm, Mr. Brown appears to contest that his order did so. We have obtained copies of the orders regarding Mr. Brown (the ex parte order and the order entered after a hearing) and take judicial notice of them. We think they clearly show that the orders themselves prohibited possession of a gun or firearm.

3

A year later, on April 27, 2022, police arrested Mr. Brown on an outstanding warrant for robbery, aggravated assault, and assault on a peace officer. He was carrying a stolen 9mm Glock 19, loaded with 15 rounds of ammunition.

### B.    Procedural Background

Defendants were indicted in the United States District Court for the District of Utah on charges of possessing a firearm while subject to a domestic-violence restraining order, in violation of 18 U.S.C. § 922(g)(8). They moved to dismiss their indictments, arguing that § 922(g)(8) was facially unconstitutional under *New York State Rifle Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024). The district court denied their motions. Defendants then entered conditional pleas that preserved their rights to appeal the district court's decisions. After sentencing, they appealed.

We abated their appeals pending the Supreme Court's decision in *Rahimi*. The Court issued its decision on June 21, 2024. *See United States v. Rahimi*, 602 U.S. 680, 680 (2024). We lifted the abatement and proceeded with briefing and oral argument.

### II.    DISCUSSION

Defendants argue that (C)(ii) violates the Second Amendment on its face. A facial challenge "is the most difficult challenge to mount successfully." *Id.* at 693 (internal quotation marks omitted). To succeed, Defendants must "establish that *no* set of circumstances exists under which [(C)(ii)] would be valid." *Id.* (emphasis added, internal quotation marks omitted). The government, on the other hand, "need

4

only demonstrate that [(C)(ii)] is constitutional in some of its applications" to prevail. *Id.* at 694. We hold that (C)(ii) "is constitutional as applied to the facts of [Defendants'] own case[s]." *Id.* at 693. Their facial challenges therefore fail. *See id.* at 693, 700.

In *Rahimi*, 602 U.S. at 700, the Supreme Court rejected a facial challenge to 18 U.S.C. § 922(g)(8)(C)(i) ("(C)(i)"). That provision bars firearm possession by individuals subject to a domestic-violence restraining order that includes a finding that the individual poses a credible threat to another's physical safety. *See id.* at 684–85.

The Court explained that the test for conformance with the Second Amendment is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. Courts "must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* (brackets and internal quotation marks omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.* "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.*

The Court upheld (C)(i). Its historical review focused on two types of laws as appropriate antecedents to that provision. The first—surety laws—"authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Id.* at 695. These laws "provided a mechanism for preventing violence *before* it

5

occurred." *Id.* at 697 (emphasis added). The second—going-armed laws—"prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* (brackets and internal quotation marks omitted). These laws "provided a mechanism for punishing those who *had* menaced others with firearms." *Id.* (emphasis added). Together, these "two distinct legal regimes," *id.* at 694, "confirm[ed] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," *id.* at 698.

The Court therefore had "no trouble concluding that Section 922(g)(8) survive[d] Rahimi's facial challenge." *Id.* at 700. It emphasized four features of (C)(i). First, (C)(i) aims to "mitigate demonstrated threats of physical violence." *Id.* at 698. Second, it does not "broadly restrict arms use by the public generally." *Id.* Third, (C)(i) "applies only once a court has found that [a] defendant represents a credible threat to the physical safety of another." *Id*. at 699 (internal quotation marks omitted). Finally, (C)(i)'s penalty (temporary disarmament) is of "limited duration" and constitutes a less severe punishment than the imprisonment provided in the Founding Era going-armed laws. *Id.*

As Defendants emphasize, *Rahimi*'s holding was explicitly limited to the constitutionality of (C)(i). *See id.* at 693. But we need not return to square one in our consideration of (C)(ii). Almost everything the Court said about (C)(i) applies equally to (C)(ii). Both (C)(i) and (C)(ii) pursue the same goal: "to mitigate demonstrated threats of physical violence." *Id*. at 698. Neither provision seeks to

"broadly restrict arms use by the public generally." *Id.* Both (C)(i) and (C)(ii) restrict a person's right to bear arms only temporarily; they prohibit firearm possession "so long as the defendant 'is' subject to a restraining order." *Id*. at 699 (quoting 18 U.S.C. § 922(g)(8)). The penalty imposed by (C)(ii) is the same as the penalty imposed by (C)(i): temporary disarmament. *See id.* And (C)(ii)—like (C)(i)—applies only after a court has issued a domestic-violence restraining order. *See id*.

The sole difference between (C)(i) and (C)(ii) concerns the language of the restraining order. *See United States v. Combs*, No. 23-5121, 2024 WL 4512533, at *3 (6th Cir. Oct. 17, 2024) (unpublished) ((C)(ii) "differs from" (C)(i) "only in terms of how it requires proof of dangerousness"). (C)(i) requires that the court order include "a finding that such person represents a credible threat to the physical safety of such intimate partner or child." 18 U.S.C. § 922(g)(8)(C)(i). (C)(ii), in contrast, does not require the order to contain such a finding. Instead, (C)(ii) simply requires the order to "by its terms explicitly prohibit[] the use, attempted use, or threatened use of physical force against such an intimate partner or child that would reasonably be expected to cause bodily injury." *Id*. § 922(g)(8)(C)(ii).

This difference, however, is of no constitutional import, at least on a facial challenge. *Rahimi* allows a court to disarm a "threatening individual" if it makes a judicial determination that the "individual poses a clear threat of physical violence to another." 602 U.S. at 698. (C)(i) satisfies this requirement though an express finding. (C)(ii) "establishes the same point by reasonable inference from the fact that a

7

defendant is subject to [an order prohibiting such behavior]." *United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012).

Defendants challenge this inference, arguing that there is "no legal basis to simply assume that a protective order not to commit violence, standing alone, is the equivalent of a factual finding that the person will likely commit an act of violence." Gordon Br. at 12; *see* Brown Br. at 13 (same). As they see it, if all (C)(ii) orders followed a court finding of dangerousness, there would be no reason for (C)(ii), since every (C)(ii) order "would qualify for restriction under [(C)(i)] anyway." Gordon Br. at 13; *see* Brown Br. at 13 (same). They argue that *Rahimi* "only justif[ies] firearm restrictions which are based upon an *explicit* judicial finding, founded on evidence, of a clear future threat of violence to others." Gordon Br. at 17 (emphasis added); *see* Brown Br. at 17 (same).

We disagree. The reasoning in *Rahimi* does not turn on the particular *form* that the judicial determination of dangerousness takes. Nor have Defendants pointed us to any historical surety statute cited in *Rahimi*, 602 U.S. at 695–96, or *Bruen*, 597 U.S. at 56 & n.23, mandating that a judicial determination of dangerousness be memorialized in writing.

We see no reason to impose an explicit-written-finding requirement here, particularly when the inference of a finding is so strong. A (C)(ii) order cannot be issued on a judicial whim. When Congress enacted § 922(g)(8), it "legislated against the background of the almost universal rule of American law that for a temporary injunction to issue, there must be a *likelihood* that irreparable harm will occur."

8

*United States v. Perez-Gallan*, 125 F.4th 204, 214 (5th Cir. 2024) (internal quotation marks omitted); *see* 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2013) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown."). Congress could reasonably assume "that the laws of the several states were such that court orders, issued after notice and hearing, should not embrace the prohibitions of paragraph (C)(ii) unless evidence created by the court reflected a real threat or danger of injury to the protected party by the party enjoined." *Perez-Gallan*, 125 F.4th at 215 (ellipsis and internal quotation marks omitted) (recognizing that the "application of (C)(ii)" is often "no different from the application of (C)(i)" because, in both situations, a court must find that the defendant poses a credible threat of harm against another).

Utah law is no exception. After notice and a hearing, a court may issue an initial cohabitant-abuse protective order only if it appears that "domestic violence or abuse has occurred" or that "there is a substantial likelihood [that] domestic violence or abuse will occur." Utah Code Ann. § 78B-7-603(1)(b) (2023). And, in particular, an order, such as the orders entered against Defendants, can "prohibit the respondent from purchasing, using, or possessing a firearm or other weapon specified by the court" only if the court "find[s] that the respondent's use or possession of a weapon may pose a serious threat of harm to the petitioner." *Id.* § 78B-7-603(2)(f), (3)(a) (incorporating (2)(f) for orders after hearings).

9

Defendants counter that protective orders are broadly available under Utah law. The term *domestic violence*, they say, includes not only "criminal offense[s] involving violence or threats of violence against a cohabitant," but also "non-violent crimes" such as electronic-communication harassment, receiving a bribe as a witness, and voyeurism. Gordon Br. at 14 (internal quotation marks omitted); *see* Brown Br. at 14 (same). They also emphasize that a Utah protective order can be predicated on a "prior act of abuse . . . remote in time from the request of the order." Gordon Br. at 14–16 (citing *Bailey v. Bayles*, 52 P.3d 1158, 1160–61 & n.1, 1166 (Utah 2002), as endorsing such an order); *see* Brown Br. at 14–16 (same).

Perhaps there could be a domestic-violence protective order in Utah that satisfied (C)(ii) but was not based on implicit findings that could satisfy (C)(i) (although we do not see how that could be the case with a proper order restricting possession of firearms, as in the orders at issue here). But Defendants cannot prevail on a facial challenge by invoking possible outliers that "might raise constitutional concerns." *Rahimi*, 602 U.S. at 701. Instead, Defendants must show that *no* domestic-violence protective order in Utah that satisfies (C)(ii) rests on implicit findings that satisfy (C)(i). *See id.* at 693 (requiring statute to have just one permissible application to survive a facial challenge); *Perez-Gallan*, 125 F.4th at 215–16 (relying on a "hypothetical," "potential [constitutional] application" of (C)(ii) to "doom [a] facial challenge" to the statute). As in *Rahimi*, Defendants utterly fail in that endeavor because the orders issued in their very own cases are constitutionally sufficient. Utah courts ordered both Defendants not to possess firearms; and a Utah court can issue

10

such an order only if it finds that "the respondent's use or possession of a weapon may pose a serious threat of harm to the petitioner." Utah Code Ann. § 78B-7-603(2)(f).

**III.     CONCLUSION**

We **AFFIRM** Defendants' convictions.