# In the Iowa Supreme Court

No. 23–1391

Submitted February 19, 2025—Filed June 27, 2025
Amended August 26, 2025

**State of Iowa,**

Appellee,

vs.

**Jordan Kevin Cole,**

Appellant.

Appeal from the Iowa District Court for Story County, Steven P. Van Marel, judge.

A defendant appeals his conviction for possession of firearms while under a domestic violence protective order entered pursuant to Iowa Code section 724.26(2)(*a*), claiming violations of the Second Amendment and article I, section 1A of the Iowa Constitution and an error in his sentence. **Convictions Affirmed and Case Remanded for Entry of Corrected Sentencing Order.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield and McDonald, JJ., joined. Christensen, C.J., filed a concurring opinion. May, J., filed a dissenting opinion, in which Oxley and McDermott, JJ., joined.

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Olivia D. Brooks (argued), Assistant Attorney General, for appellee.

**Waterman, Justice.**

Jordan Cole consented to the entry of a one-year protective order in a domestic abuse case. The consent order expressly prohibited Cole from possessing firearms pursuant to Iowa Code section 724.26(2)(*a*) (2022). Despite this prohibition, Cole pawned some stolen firearms while the protective order was in effect. The State charged Cole with theft and violations of Iowa Code section 724.26(2)(*a*). The theft charge was dropped, and Cole was convicted of two violations of section 724.26(2)(*a*). The court sentenced Cole to concurrent prison sentences, which were suspended with probation.

On appeal, Cole challenges his convictions by claiming that section 724.26(2)(*a*)'s firearm prohibition is unconstitutional under the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. We reject these challenges. By expressly agreeing to give up his right to possess firearms for the one-year term of the protective order, Cole waived his Second Amendment and article I, section 1A rights. So we affirm his convictions.

Cole also argues that the district court's sentencing order includes an unlawful provision. It provides that if Cole's probation is revoked in the future, his prison sentences shall be served consecutively. We agree with Cole that this provision is unlawful. So we remand for entry of a corrected sentencing order.

### I. Background Facts and Proceedings.

Although this is an appeal from two Story County criminal cases, the relevant facts begin with a Hamilton County civil proceeding under Iowa Code chapter 236, our domestic abuse act. Our record of the proceeding consists of a "Protective Order by Consent Agreement" (consent order), dated March 7, 2022. The consent order reports that on March 7, "a hearing was held on [a] Petition for Relief from Domestic Abuse." The consent order also notes that Cole, the

"Respondent/Defendant" in that proceeding, was present for the hearing, as was the "Petitioner/Protected Party," whom we call Julie. The consent order also states the court's finding that "[i]t has jurisdiction over the parties and subject matter and [Cole] has been provided with reasonable notice and opportunity to be heard." And the order states that "[t]he parties appeared and each consented to the entry of this order."

In his appellate briefing in this criminal appeal, Cole repeatedly acknowledges that he *consented* to the protective order, writing such statements as:

- "The order was entered via consent agreement . . . ."
- "Cole consented to entry of the protective order . . . ."
- "The order was entered by a consent agreement . . . ."
- "Cole was not convicted of domestic abuse, but consented to the entry of a civil protective order."
- "[Cole] consented to entry of the protective order."
- "Cole's protective order was entered pursuant to a consent agreement."

The consent order included an unchecked box that said, "If checked, [Cole] committed a domestic abuse assault against [Julie]." But to commence the proceeding, and as a prerequisite to entry of this order, Julie had to have filed a petition alleging that Cole assaulted her. *See* Iowa Code § 236.3(1)(*e*).

The consent order then provided as follows:

[Cole] is restrained from committing further acts of abuse or threats of abuse. [Cole] is restrained from any contact with [Julie]. . . .

. . . .

1. [Cole] shall not threaten, assault, stalk, molest, attack, harass or otherwise abuse [Julie]. [Cole] shall not use, or attempt to

use, or threaten to use physical force against [Julie] that would reasonably be expected to cause bodily injury.

2. [Cole] shall not communicate with [Julie] in person or through any means including third persons. . . .

3. [Julie] shall have exclusive possession of the residence . . . . [Cole] shall not go to, enter, occupy or remain in that residence or any other residence in which [Julie] is staying, under any circumstance.

. . . .

5. [Julie] is granted temporary custody of [two children whose identifiers we have omitted]. [Cole] is granted visitation with these children . . . . [Cole] shall not otherwise contact these children and shall not contact [Julie] about visitation except as provided in this order.

6. [Cole] shall not possess, ship, transport or receive firearms, offensive weapons, or ammunition while this order is in effect pursuant to Iowa Code section 724.26(2)(*a*). [Cole] shall deliver all firearms, offensive weapons, and ammunition to the HAMILTON County Sheriff or other law enforcement agency on or before March 15, 2022. [Cole] is advised that the issuance of this protective order may also affect the right to possess or acquire a firearm or ammunition under federal law 18 U.S.C. sections 922(d)(8), (g)(8).

7. A RESPONDENT WHO VIOLATES THIS ORDER FACES IMMEDIATE ARREST. Violation may occur even if the protected party consents to conduct that is prohibited by this order. Only the court can relieve respondent from the restrictions contained in this order.

8. This order is effective immediately.

(Boldface omitted.) The order was signed by a district court judge, and a copy of the order was served on Cole. The order expressly restrained Cole, not Julie. It was not a "mutual" protective order.[1]

---

[1]Iowa courts are prohibited from issuing "mutual protective orders against the victim and the abuser unless both file a petition requesting a protective order." Iowa Code § 236.20; *see also* *United States v. Perez-Gallan*, 125 F.4th 204, 216 (5th Cir. 2024) (addressing judicial concerns over "mutual" protective orders where "an abused woman could lose her right to possess a gun just because her violent domestic partner is awarded a mutual protective order against her, even if there are no indications that the wom[a]n herself is dangerous").

The consent order went on to state that it "shall remain in effect until" March 7, 2023, "unless . . . modified, terminated, extended, or superseded by written order of the court, or until the dismissal of the case." And the order included this additional warning: "**Federal <u>and state</u> laws provide penalties for possessing, transporting, shipping, or receiving any firearm or ammunition. (18 U.S.C. 922(g)(8)); <u>Iowa Code Section 724.26(2)(*a*)</u>.**" Cole was thereby warned.

Cole did not object to entry of the consent order. Nor did Cole ask the district court to reconsider any term in the order or to vacate the consent order. Cole never appealed from the consent order, and he is not collaterally attacking the consent order in this criminal appeal.

We now turn to the two criminal cases from which this appeal arises. The two cases were initiated in January and March 2023, respectively. In the January case, Cole was accused of pawning a Carl Gustaf rifle on July 5, 2022, which was during the one-year period that Cole was prohibited from possessing firearms because of the consent order. The trial information charged Cole with one count of "Possession of a Firearm . . . By Domestic Abuse Offender," a class "D" felony under Iowa Code section 724.26(2)(*a*).

In the March case, Cole was accused of pawning a Beretta shotgun on August 31, 2022, and a Howa rifle on October 12,[2] both during the period that Cole was prohibited from possessing firearms. The trial information charged Cole with two counts of "Possession of a Firearm . . . By Domestic Abuse Offender," class "D" felonies under Iowa Code section 724.26(2)(*a*). The trial information

---

[2]This October date is from the criminal complaint. We note, however, that the trial information stated that both the shotgun and the rifle were pawned on August 31, 2022. This discrepancy does not alter our analysis or conclusions.

also included a third count for "Theft in the Second Degree." This theft charge was based on allegations that Cole had stolen the shotgun, the rifle, and other property from a woman living in Ames.

In June 2023, Cole filed a motion to dismiss in both cases. Cole argued that section 724.26(2)(*a*) was unconstitutional under the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. The district court disagreed and denied Cole's motions.

Cole and the State then reached an agreement. The State agreed to the dismissal of two charges from the March 2023 case, including the theft charge. This would leave a total of two section 724.26(2)(*a*) charges, one in each case. Cole agreed to waive his jury rights and submit these two remaining charges through a trial on the minutes of testimony.

Following the trial on the minutes, the district court found Cole guilty on both charges. Cole requested immediate sentencing, and the court agreed. The State recommended "a concurrent sentence of five years" in prison "to be fully suspended" with probation. Cole agreed with the State's recommendation.

Consistent with the parties' suggestions, the court imposed concurrent terms of incarceration not to exceed five years. The court suspended the sentences and ordered probation for up to two years. The court noted: "These probationary periods will be served concurrently. However, if the probations are ever revoked, the sentences may be ordered to be served consecutively."

The same day, the court issued a written sentencing order. It generally matched the court's statements on the bench. As to the issue of probation, however, the order stated: "If probations are ever revoked, sentences shall run consecutive."

Cole appealed, and we retained the case.

**II. Standard of Review.**

"We review constitutional claims de novo." *In re N.S.,* 13 N.W.3d 811, 820 (Iowa 2024) (quoting *Mitchell County v. Zimmerman,* 810 N.W.2d 1, 6 (Iowa 2012)). "[W]e presume statutes are constitutional, 'imposing on the challenger the heavy burden of rebutting that presumption.' " *Summit Carbon Sols., LLC v. Kasischke,* 14 N.W.3d 119, 126 (Iowa 2024) (alteration in original) (quoting *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022)). "We defer to the findings of fact made by the district court, 'but we are not bound by them.' " *State v. Young,* 15 N.W.3d 61, 64 (Iowa 2024) (quoting *State v. Bauler,* 8 N.W.3d 892, 897 (Iowa 2024)).

"Our review of the defendant's sentence is for the correction of errors at law." *State v. Duffield,* 16 N.W.3d 298, 302 (Iowa 2025). "We will not reverse a sentence unless there is 'an abuse of discretion or some defect in the sentencing procedure.' " *State v. Damme,* 944 N.W.2d 98, 103 (Iowa 2020) (quoting *State v. Formaro,* 638 N.W.2d 720, 724 (Iowa 2002)).

**III. Analysis.**

Cole raises two issues on appeal. First, he claims that his section 724.26(2)(*a*) convictions violate the United States and Iowa Constitutions. Second, he claims that even if his convictions are valid, his sentencing order must be corrected because it erroneously requires consecutive prison sentences if his probation is revoked. We start with Cole's attack on his convictions.

**A. Constitutional Challenges.** Section 724.26(2)(*a*) makes it a state law crime for a defendant to knowingly possess firearms when that defendant is

subject to a protective order that meets certain federal requirements. It states as follows:

> Except [in circumstances not relevant here], a person who is subject to a protective order under 18 U.S.C. § 922(g)(8) . . . and who knowingly possesses . . . a firearm . . . is guilty of a class "D" felony.

Iowa Code § 724.26(2)(*a*).

The relevant federal statute, 18 U.S.C. § 922(g)(8), prohibits defendants from possessing firearms "in or affecting commerce" if they are "subject to a court order that" meets three requirements. First, the order must have been "issued after a hearing of which" the defendant "received actual notice, and at which" the defendant "had an opportunity to participate." 18 U.S.C. § 922(g)(8)(A). The consent order met this requirement. Second, the order must restrain the defendant "from harassing, stalking, or threatening" the defendant's "intimate partner" or the defendant's partner's child, or "from . . . engaging in other conduct that would place" the partner "in reasonable fear of bodily injury to the partner or child." *Id.* § 922(g)(8)(B). The consent order met this requirement too. Finally, under § 922(g)(8)(C), the order must either "include[] a finding that" the defendant "represents a credible threat to the physical safety of such intimate partner or child," *id.* § 922(g)(8)(C)(i), or "by its terms explicitly prohibit[] the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury," *id.* § 922(g)(8)(C)(ii). The consent order satisfied the second alternative.

With this background, we turn to Cole's attack on his convictions. Notably, Cole does not dispute that the statutory requirements just explained were satisfied.[3] Instead, Cole claims that the firearms prohibition imposed by

---

[3]To be clear, Cole only agrees that alternative section 922(g)(8)(C)(ii) was met, not alternative (C)(i). But because only one alternative must be met, Cole does not dispute that the statutory requirements were met.

section 724.26(2)(*a*) is unconstitutional under the Second Amendment to the United States Constitution and under article I, section 1A of Iowa's constitution.

As to Iowa's constitution, Cole concedes that his offenses predated the effective date of article I, section 1A. *In re N.S.*, 13 N.W.3d at 815 (noting that section 1A went into effect after its ratification by voters on November 8, 2022). Nevertheless, he contends that because Iowa's constitution has always included an implied fundamental right to possess firearms,[4] section 1A should be applied retroactively to his case. Cole then argues that his convictions cannot survive the strict-scrutiny analysis required by section 1A. They fail strict scrutiny, Cole argues, because they are based on an order that prohibited firearm possession even though Cole had not been "convicted of an underlying criminal offense" or "found to be presumptively dangerous."

Turning to the Federal Constitution, Cole concedes that in *United States v. Rahimi*, the Supreme Court rejected a Second Amendment challenge to the prohibition imposed by 18 U.S.C. § 922(g)(8), the just-described federal statute on which section 724.26(2)(*a*) is based. 602 U.S. 680, 693–702 (2024). Indeed, *Rahimi* found that "section 922(g)(8) fits comfortably within" our nation's tradition of firearm laws "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. As Cole notes, however, the restraining order in *Rahimi* included express findings that the defendant "had committed 'family violence,' " that "this violence was 'likely to occur again,' " and that the defendant posed a "credible threat" to the protected party's "physical safety." *Id.* at 687. Conversely, although the consent order here expressly prohibited Cole from abusing or even contacting the protected party, it included

---

[4]In *State v. Downey*, 893 N.W.2d 603, 605 (Iowa 2017), we noted that "[t]he framers of the Iowa Constitution chose not to include any language in our constitution concerning the right to bear arms."

no express finding of past or projected violence. Because those findings are absent, Cole argues, the consent order cannot serve as a basis for his disarmament.

We conclude Cole's constitutional challenges must be rejected. We rest this conclusion on waiver. Cole consented to the entry of the protective order. That order expressly prohibited Cole from possessing firearms. It even included a specific deadline (March 15, 2022) by which Cole had to surrender all of his firearms to law enforcement. And the order expressly warned Cole that a violation of the order's firearm prohibitions would also violate Iowa Code section 724.26(2)(*a*) and 18 U.S.C. § 922(g)(8). It is too late now for Cole to challenge the prohibitions to which he consented or the resulting convictions.

Rather, we determine those challenges were waived through Cole's consent to an order that expressly prohibited him from possessing firearms "pursuant to Iowa Code section 724.26(2)(*a*)." *See United States v. Reese*, 627 F.3d 792, 804 n.3 (10th Cir. 2010) ("By agreeing to the imposition of the protective order, Reese arguably waived his Second Amendment rights, since the order expressly prohibited him from possessing firearms and indeed required him to turn over any firearms and ammunition to Hawaii law enforcement officials. Moreover, it is clear from the record that Reese was well aware of the restrictions placed on him by the protective order as well as the impact of that protective order under federal firearms laws."), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Schoendaller*, No. 1:18–cr–00179, 2019 WL 2746695, at *2 (D. Idaho July 1, 2019) (citing *Reese*, 627 F.3d 792, and observing that "by consenting" to a state restraining order, the defendant "arguably waived his Second Amendment rights"). As the United States Court of Appeals for the Tenth Circuit aptly concluded in *Reese*, a finding of dangerousness was not "necessary because Reese agreed, during the

hearing on Jennifer's motion for protective order, to the imposition of the protective order." 627 F.3d at 804. Cole cites no contrary authority on point.

The civil hearing on Cole's consent protective order was unreported. Without a transcript, we don't know if there was any colloquy between Cole and the judge specifically addressing Cole's waiver of his constitutional right to possess firearms.[5] We do know that Julie must have filed a petition alleging Cole assaulted her to trigger the hearing under Iowa Code chapter 236. *See* Iowa Code § 236.3(1)(*e*). Regardless, the terms of the firearm prohibition in the consent order are clear.[6] And Cole's appellate counsel in this criminal appeal confirms that Cole entered into the civil protective order *voluntarily*. His appellate brief states, "Cole was served with a copy of the petition and the temporary protective order, Cole and the protected party appeared at the hearing, Cole consented to entry of the protective order, and the district court determined Cole and the protected party were 'intimate partners.' "[7]

Neither Cole nor the dissent cite a case from any jurisdiction holding that a formal *Zerbst*-style[8] colloquy is required to voluntarily relinquish Second Amendment rights in a consent protective order. We encourage our district

---

[5]Iowa courts routinely accept written guilty pleas from represented as well as self-represented defendants without any in-person court colloquy, resulting in valid class "D" felony and misdemeanor convictions. *See* Iowa R. Crim. P. 2.8(4).

[6]The dissent questions whether Cole actually read the order. Cole of course had the opportunity to read the order, and he never claims he did not know what it said. Our court has never held that a consent protective order is unenforceable on grounds that the respondent declined to read it. Such a holding would eviscerate the protections chapter 236 affords battered domestic partners.

[7]This court order signed by a district court judge enjoys a presumption of validity. *See Murillo v. State*, 13 N.W.3d 800, 810 (Iowa 2024); *Damme*, 944 N.W.2d at 106 (noting that it is the defendant's burden to overcome the presumption of validity). Cole has offered no evidence or argument to call into question the validity of the hearing in which he consented to entry of the protective order.

[8]A *Zerbst*-style colloquy requires the trial judge to determine "whether there is an intelligent and competent waiver" of a constitutional right in a discussion made "upon the record." *See Johnson v. Zerbst*, 304 U.S. 458, 465 (1938).

courts to engage in such colloquies. But we determine that the terms of Cole's consent order are sufficient to establish his waiver of his constitutional rights to possess firearms. *See United States v. Deng*, 104 F.4th 1052, 1054 (8th Cir. 2024) (holding that a guilty plea waived Second Amendment challenge); *Reese*, 627 F.3d at 804 n.3 (observing that "agreeing to the imposition of the protective order" arguably waived defendant's Second Amendment rights); *Cooper v. State*, 903 S.E.2d 770, 776 (Ga. Ct. App. 2024) (rejecting defendant's claim that he "must be explicitly advised that he is waiving his Second Amendment rights" to constitute a valid waiver).

It's true that in *Rahimi*, the defendant had consented to the entry of the protective order that prohibited his possession of a firearm, but the Supreme Court did not rely on that fact in rejecting his Second Amendment challenge. *See* 602 U.S. at 686–87. The dissent suggests that because the Supreme Court bypassed a waiver analysis, the Court implicitly found that Rahimi did not waive his Second Amendment rights.[9] In our view, silence doesn't amount to a holding, or even dicta. We are bound by what the Supreme Court says; we are not bound by conjecture.

The dissent primarily relies on *Class v. United States*, 583 U.S. 174 (2018). Class was arrested when he parked his car containing firearms on the grounds of the United States Capitol. *Id.* at 176. He was charged with violating a federal statute, 40 U.S.C. § 5104(e)(1), which prohibits the possession of firearms on

---

[9]The dissent argues that the *Rahimi* Court's silence on waiver supports rejection of the State's waiver argument here. Yet the dissent's willingness to infer significance from silence stops there. The same dissent incongruently argues that the Iowa protective order should *not* be read to include an "implied finding" of Cole's dangerousness. *See United States v. Gordon*, 137 F.4th 1153, 1157–58 (10th Cir. 2025) (holding that "an explicit-written-finding" of dangerousness is not required because a finding of dangerousness can be inferred from the entry of the protective order). Our waiver analysis does not rely on any implied finding of abuse or dangerousness in Cole's protective order. Rather, our waiver holding is based on the express firearm prohibition in the consent protective order.

Capitol grounds. *Id.* He moved to dismiss the charge on the grounds that the statute was facially unconstitutional under the Second Amendment. *Id.* The district court rejected his Second Amendment challenge, and Class then entered into a plea agreement that waived some defenses and preserved others for appeal but was silent as to his right to appeal his constitutional challenge to § 5104(e)(1). *Id.* at 176–77. On appeal, Class again raised his claim that the statute violated the Second Amendment. *Id.* at 178. The United States Court of Appeals for the D.C. Circuit held that "Class could not raise his constitutional claims because, by pleading guilty, he had waived them." *Id.* The Supreme Court reversed, concluding that "a guilty plea *by itself* does not bar" the defendant's direct appeal challenging the statute of conviction as unconstitutional. *Id.* at 176 (emphasis added). *Class* left open the possibility of waiver or forfeiture of constitutional challenges by other conduct, as federal appellate courts recognize:

> *Class*'s holding was relatively narrow. The Supreme Court held that a criminal defendant who pleads guilty does not necessarily waive challenges to the constitutionality of the statute under which he is convicted. The Court did not, however, hold that such claims are not waivable at all: The Court addressed only whether a guilty plea constitutes a waiver "by itself." The Court twice emphasized that Class had not waived his objections through conduct other than his guilty plea, thus making clear that the Court was addressing only the effect of pleading guilty. Al Bahlul did not plead guilty, so *Class* is irrelevant to this case.

*Al Bahlul v. United States*, 967 F.3d 858, 875 (D.C. Cir. 2020) (citations omitted); *see also United States v. Pittman*, 125 F.4th 527, 531–32 (4th Cir. 2025) (holding that defendant forfeited constitutional claim where defendant pleaded guilty and did not timely raise the claim before the district court); *United States v. Turner*, 124 F.4th 69, 73, 78 (1st Cir. 2024) (holding that defendant "waived his as-applied Second Amendment claim by failing to move timely for dismissal of the felon-in-possession count" and observing that "Turner's mention of *Class* does not afford him a free pass").

Unlike Cole, Rodney Class never consented to the entry of a protective order that he did not appeal and that expressly required him to surrender his firearms to the sheriff while prohibiting his possession of firearms for one year. *Class* is inapposite for that reason, which presumably explains why Cole himself never cited *Class* below or in this appeal. The dissent cites no case applying *Class* to reject a waiver claim arising from a firearm prohibition in a consent protective order, and we found none.

We conclude that Cole's firearm rights under the Second Amendment and article I, section 1A of the Iowa Constitution, are subject to waiver. Courts have found defendants waived Second Amendment rights under analogous circumstances. For example, in *State v. Maietta*, the Connecticut Supreme Court held "that the defendant waived his second amendment right when he agreed to the condition of his probation barring him from possessing firearms." 134 A.3d 572, 581 (Conn. 2016). Similarly, in *Roman v. State*, the Texas Court of Appeals held that the defendant waived his Second Amendment challenge when he accepted a firearm ban among the terms of his deferred-adjudication community supervision. 571 S.W.3d 317, 321–23 (Tex. App. 2018) (rejecting defendant's argument that "his Second Amendment right is not one that he can waive"); *see also Turner*, 124 F.4th at 73; *Deng*, 104 F.4th at 1054 ("Deng's as-applied [Second Amendment] challenge fails too because he waived it by pleading guilty unconditionally."); *State v. Kates*, 694 S.W.3d 462, 465 (Mo. Ct. App. 2024) (holding that defendant's guilty plea waived Second Amendment challenge to felon-in-possession statute); *People v. Johnson*, 225 A.D.3d 453, 454–55 (N.Y. App. Div. 2024) (holding that defendant's guilty plea waived right to bring Second Amendment challenge on appeal).

Iowans regularly waive constitutional protections with far less formality and without the court hearing and judicial imprimatur reflected in Cole's consent

order. For example, before any criminal charges are filed, Iowans can and do waive their rights under the Fourth Amendment and article I, section 8 of the Iowa Constitution when they consent to an officer's search without being informed of their right to refuse. *See, e.g., State v. Hauge*, 973 N.W.2d 453, 466 (Iowa 2022). Iowans can and do waive their right to remain silent without a *Miranda* warning during noncustodial questioning by police at a crime scene. *See, e.g., State v. Park*, 985 N.W.2d 154, 170–71 (Iowa 2023). And Iowans routinely waive their constitutional rights in court proceedings in a variety of contexts. *State v. Johnson*, 770 N.W.2d 814, 822 (Iowa 2009) ("A broad array of constitutional and statutory rights protecting defendants in criminal cases may be waived."); *see, e.g., Park*, 985 N.W.2d at 174 (waiver of right to counsel and right to remain silent in custodial interrogation following *Miranda* warning); *State v. Miller*, 975 N.W.2d 807, 818 (Iowa 2022) (waiver of right to counsel for trial); *State v. Basquin*, 970 N.W.2d 643, 659–60 (Iowa 2022) (waiver of trial rights through a written guilty plea); *State v. Liddell*, 672 N.W.2d 805, 813–14, (Iowa 2003) (waiver of right to jury trial); *State v. Magnuson*, 308 N.W.2d 83, 86 (Iowa 1981) (waiver of right to speedy trial); *see also State v. Gomez Garcia*, 904 N.W.2d 172, 179 (Iowa 2017) (waiver of statutory right to an interpreter). Cole himself undisputably waived his constitutional right to a jury trial in this case.

Federal courts likewise routinely uphold waivers of constitutional rights. *See, e.g., United States v. Moon*, 33 F.4th 1284, 1299 n.14 (11th Cir. 2022) (holding that the constitutional "public-trial right may be waived by a defendant's counsel on his behalf"); *United States v. Garske*, 939 F.3d 321, 332 (1st Cir.

2019) ("Of course, the right to a constitutional jury may be waived."); *United States v. Stanley*, 891 F.3d 735, 738 (8th Cir. 2018) (holding that the constitutional right to counsel may be waived); *United States v. Obak*, 884 F.3d 934, 937 (9th Cir. 2018) (holding that the constitutional venue right may be waived). Cole cites no authority holding that firearm rights cannot be waived.

We hold that Cole waived his firearm rights under both the Second Amendment and article I, section 1A of the Iowa Constitution when he voluntarily agreed to the entry of the consent protective order that prohibited his possession of firearms for one year. We therefore reject his constitutional challenges and affirm his convictions under Iowa Code section 724.26(2)(*a*). A contrary holding would call into question the enforceability of firearm prohibitions in consent orders of protection.

The dissent concocts a novel anti-waiver argument that would hold any waiver of Cole's Second Amendment rights in his consent protective order ("Case 1") is limited to that proceeding and waived no rights in this separate criminal prosecution ("Case 2"). The dissent cites no case on point that adopts that theory. The dissent's approach would severely undermine the enforcement of firearm prohibitions in protective orders. Enforcement of a protective order through contempt proceedings in the same "Case 1" is limited to a maximum of six months in jail. *See* Iowa Code § 665.4(1). By contrast, a violation of the firearm prohibition can be prosecuted in a separate criminal case ("Case 2") as here, with a potential prison sentence of up to five years. *See id.* § 724.26(2)(*a*); *id.* § 902.9(*e*). Cole agreed to the entry of the consent protective order that expressly warned he could be prosecuted criminally for possession of a firearm under "Iowa Code Section 724.26(2)(*a*)." That warning was not written in disappearing ink.

Because we hold that Cole waived his claims under the Second Amendment and article I, section 1A of the Iowa Constitution by consenting to the terms of the protective order, we do not reach the merits of his challenge to the constitutionality of 18 U.S.C. § 922(g)(8)(C)(ii) or Iowa Code section 724.26(2)(*a*). "Avoidance of constitutional issues except when necessary for proper disposition of [a] controversy is a bulwark of American jurisprudence." *State v. Kieffer*, 17 N.W.3d 651, 667 (Iowa 2025) (alteration in original) (quoting *Salsbury Lab'ys v. Iowa Dep't of Env't Quality*, 276 N.W.2d 830, 837 (Iowa 1979)).[10]

**B. Sentencing Issues.** We move on to Cole's sentencing challenge. The parties agree that during the sentencing hearing, the court imposed concurrent prison terms, suspended them, and ordered probation. The court warned, however, that if probation were revoked, the prison terms could be run consecutively. Then, in its written sentencing order, the court said: "If probations are ever revoked, sentences *shall* run consecutive." (Emphasis added.)

Cole points to two problems in this sentencing process. The first is the discrepancy between the court's oral pronouncement, which suggested that a future revocation *could* involve consecutive prison sentences, and the written order, which said that a future revocation *shall* result in consecutive prison sentences. As Cole notes, it is a "rule of nearly universal application" that "where there is a discrepancy between the oral pronouncement of sentence and the written judgment and commitment, the oral pronouncement of sentence controls." *State v. Hess*, 533 N.W.2d 525, 528 (Iowa 1995) (quoting *State v.*

---

[10]We note that based on the Supremacy Clause of the United States Constitution, a valid federal prohibition on possession of firearms would preclude relief under article I, section 1A of the Iowa Constitution. *Kieffer*, 17 N.W.3d at 667.

*Brydon*, 454 A.2d 1385, 1388 (Me. 1983)). And "when a judgment entry incorrectly differs from the oral rendition of the judgment merely as a result of clerical error," we have held "that the proper remedy is for the district court to correct the written judgment entry by issuing a nunc pro tunc order." *Id.* at 527, 529. This would seem to suggest that we should direct the district court to issue a nunc pro tunc order to conform with the sentencing judge's oral pronouncement.

As Cole also points out, there is another problem to consider. As explained, in the court's oral pronouncement (as well as in its written order), the court suggested that consecutive sentences would be a proper outcome in the event of revocation. We agree with Cole that this suggestion was incorrect. If Cole's probation were revoked, it would not be lawful to order consecutive sentences. Iowa Code section 908.11(4) governs the court's options when a probation violation is established. If the court elects to revoke probation, section 908.11(4) permits the court to "require the defendant to serve the sentence imposed or any lesser sentence." Iowa Code § 908.11(4). This means that a revocation court may only order the sentence that was *originally* imposed at sentencing (although suspended) or "any lesser sentence." *Id.* The revocation court may not order a *greater* sentence than what was originally imposed. *See id.* So where, as here, the sentencing court ordered concurrent prison terms, the revocation court may not impose the greater sentence of consecutive prison terms. The most severe option at revocation would be the original sentence of concurrent prison terms. *See State v. Collins*, No. 21–0638, 2022 WL 949747, at *2 (Iowa Ct. App. Mar. 30, 2022) (observing that consecutive sentences can be imposed "after a probation

violation" only if the court "imposed consecutive terms in the original sentencing proceeding").[11]

Accordingly, we remand for entry of a corrected sentencing order that omits any suggestion that Cole's sentences for his current convictions may or shall be run consecutive to one another if his probation is revoked.

We add one final observation. In cases where multiple options are available at revocation (e.g., consecutive versus concurrent terms), the revocation court must exercise its own independent discretion when selecting the proper option. *See State v. Covel*, 925 N.W.2d 183, 187–88 (Iowa 2019) (discussing the two-step process for revocation proceedings); *State v. Darrin*, 325 N.W.2d 110, 113 (Iowa 1982) ("[T]he trial court's order revoking probation must be based on more than a simple reevaluation of the information known by the trial judge at the time of sentencing."). Orders granting probation should not purport to restrict the revocation court's exercise of that discretion.

**IV. Disposition.**

We affirm Cole's convictions. We remand for entry of a corrected sentencing order that is consistent with part III.B of this opinion.

**Convictions Affirmed and Case Remanded for Entry of Corrected Sentencing Order.**

Christensen, C.J., and Mansfield and McDonald, JJ., join this opinion. Christensen, C.J., files a concurring opinion. May, J., files a dissenting opinion, in which Oxley and McDermott, JJ., join.

---

[11]Our discussion here only addresses the two convictions at issue in this appeal. We do not address the possibility of new convictions with new sentences, which might be run either concurrently or consecutively to sentences for the convictions at issue in this appeal.

**Christensen, Chief Justice (concurring).**

I am joining the majority opinion in full, as I agree that Cole waived his Second Amendment and article I, section 1A constitutional rights. However, I write separately to address the dissent's arguments concerning the judicial determination of dangerousness in this case.

Domestic violence is a widespread, enduring problem, and firearms are a major contributor to that problem. In fact, firearms are responsible for more intimate partner homicides than all other weapons combined. *State v. Rumpff*, 308 A.3d 169, 182 (Del. Super. Ct. 2023). And their threat is not limited to intimate partners, as "domestic violence encounters often endanger police officers due to their volatile and unstable nature." *Id.*

Undermining the efficacy of firearm prohibitions in protective orders could intensify that threat by placing battered domestic partners and the professionals who work to protect them at greater risk. In the United States, an average of twenty-four people per minute are victims of abuse by an intimate partner, which is approximately twelve million people per year. *Domestic Violence Statistics*, Nat'l Domestic Violence Hotline, https://www.thehotline.org/stakeholders/domestic-violence-statistics/ [https://perma.cc/EZ48-3R9L]. In Iowa alone, the Iowa Attorney General's Office reported that 386 Iowans died in suspected domestic violence homicides over an almost twenty-nine-year timeframe. Victim Assistance Section, Iowa Att'y Gen.'s Off., *Domestic Violence Fatality Chronicle* (2023) [https://perma.cc/2A9J-JD8V]. This court has also noted the pervasiveness of domestic abuse in Iowa, particularly among women. *Linn v. State*, 929 N.W.2d 717, 734 (Iowa 2019) ("In 2010, among the 24,000 reports of domestic abuse in Iowa, approximately eighty percent to eighty-five percent were crimes against women.").

Domestic abuse becomes even more harmful when the abuser has access to a firearm. Natalie Nanasi, *Disarming Domestic Abusers*, 14 Harv. L. & Pol'y Rev. 559, 562–63 (2020). "[S]everal studies support the conclusion that domestic violence-related firearm restrictions generally lower the number of intimate-partner homicides." Aaron Edward Brown, *This Time I'll Be Bulletproof: Using ex parte Firearm Prohibitions to Combat Intimate-Partner Violence*, 50 Colum. Hum. Rts. L. Rev. 159, 182 (2019); *see id.* at 179–82 (summarizing and collecting studies). For example, one study concluded that firearm-related intimate partner homicide rates decrease by fourteen percent when state laws prohibit individuals with domestic-violence-related restraining orders from possessing firearms and require them to relinquish firearms. Carolina Díez et al., *State Intimate Partner Violence-Related Firearm Laws and Intimate Partner Homicide Rates in the United States, 1991 to 2015*, 167 Annals Internal Med. 536, 536 (2017).

Courts across the country have further articulated the harmful impact that guns have in domestic violence situations. The Seventh Circuit stated that "[d]omestic assaults with firearms are approximately twelve times more likely to end in the victim's death than are assaults by knives or fists." *United States v. Skoien*, 614 F.3d 638, 643 (7th Cir. 2010) (en banc). The First and Third Circuits have also noted the evidence linking firearms and domestic violence fatalities. *United States v. Boyd*, 999 F.3d 171, 188–89 (3d Cir. 2021) (noting extensive evidence linking firearms and domestic violence fatalities); *United States v. Booker*, 644 F.3d 12, 25–26 (1st Cir. 2011) ("According to figures collected by the Justice Department and included in the record here, nearly 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders (33,500).").

Federal courts have upheld the constitutionality of the federal firearm prohibition in 18 U.S.C. § 922(g)(8)(C)(ii) without an express judicial finding of dangerousness, acknowledging the well-documented dangerousness posed by domestic abusers having access to firearms—these types of challenges to the section were rejected before and after the U.S. Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024). *See, e.g., United States v. Gordon*, 137 F.4th 1153, 1155–57 (10th Cir. 2025) (applying *Rahimi* to reject a facial constitutional challenge to § 922(g)(8)(C)(ii)); *United States v. Perez-Gallan*, 125 F.4th 204, 215–16 (5th Cir. 2024) (same); *United States v. Combs*, No. 23–5121, 2024 WL 4512533, at *3 (6th Cir. Oct. 17, 2024) (same); *Boyd*, 999 F.3d at 185–89 (rejecting an as-applied constitutional challenge to § 922(g)(8)(C)(ii) before *Rahimi*); *United States v. Zamboroski*, No. 24–CR–93–A, 2025 WL 378397, at *2–3 (W.D.N.Y. Feb. 4, 2025) (rejecting facial and as-applied challenges after *Rahimi*).

Federal courts have consistently rejected constitutional challenges to § 922(g)(8)(C)(ii). *See, e.g., Boyd*, 999 F.3d at 176 ("In upholding § 922(g)(8) against this as-applied constitutional challenge, we now join the other circuits to have considered the issue."). The dissent contends that there was not a finding of dangerousness in this case sufficient to restrain the defendant from possessing firearms, but that conclusion is not in line with current federal law and could have harmful consequences in Iowa. A reversal of Cole's conviction would set a dangerous precedent, endangering victims of domestic abuse even further.

**May, Justice (dissenting).**

## I. Introduction.

The Second Amendment right to keep and bear arms is a "fundamental" constitutional right that is "necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). But some worry that lower courts are starting to treat the Second Amendment right as "a second-class right." *Snope v. Brown*, 145 S. Ct. 1534, 1539 (2025) (mem.) (Thomas, J., dissenting from the denial of certiorari) (quoting *McDonald*, 561 U.S. at 780). I have similar worries here.

Jordan Kevin Cole is being prosecuted for violating a statute that makes it a felony—a prison offense—for him to possess firearms, that is, to keep and bear arms. Yet our court refuses to even consider Cole's Second Amendment challenge to that statute. This refusal is justified, the court says, because Cole allegedly waived his challenge when he consented to the entry of a protective order in a separate civil proceeding that ended months before this felony prosecution was even brought.

I disagree. Cole's right to bring Second Amendment challenges in future criminal cases was not even addressed—much less waived—in that prior civil proceeding. Our court's refusal to consider Cole's challenge is erroneous in several respects:

1. It is inconsistent with the Supreme Court's approach in *United States v. Rahimi*, 602 U.S. 680 (2024).

2. It is contrary to the Supreme Court's general standards for evaluating waivers of fundamental constitutional rights.

3. It is inconsistent with the Supreme Court's holding in *Class v. United States*, 583 U.S. 174 (2018).

4. It is not supported by the cases cited in the majority opinion.

We should reach the merits of Cole's Second Amendment challenge. And—based on controlling Supreme Court precedent—his challenge should succeed. So we should reverse his convictions and remand the case for dismissal. I respectfully dissent.

## II. *Rahimi* Weighs Against a Finding of Waiver.

As we begin to think about the waiver issue, it's important to realize that the State has not found any case from any jurisdiction in which any court has refused to consider the merits of a Second Amendment challenge to a criminal firearms prohibition because of the defendant's consent to the entry of a protective order in a prior civil case. The majority does not cite such a case, either.[12]

I haven't found one, either. It looks like only two courts—the Tenth Circuit Court of Appeals and a federal district court—have even *entertained* the idea that consent to a protective order could waive a subsequent Second Amendment challenge to a criminal statute. *See United States v. Reese*, 627 F.3d 792, 804 n.3 (10th Cir. 2010), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Schoendaller*, No. 1:18–cr–00179, 2019 WL 2746695, at *2 (D. Idaho July 1, 2019) (citing *Reese*, 627 F.3d 792). And, in both cases, the courts would only go so far as to say that the prior consent had "arguably" resulted in a waiver. *Reese*, 627 F.3d at 804 n.3; *Schoendaller*, 2019 WL 2746695, at *2. *Neither* court was willing to say that a waiver had actually occurred. And neither was willing to base its *resolution* of the defendant's Second Amendment challenge on a theory of consent or waiver. Instead, the courts in both cases did just what we should do here: they

---

[12]More on this in part V.

*addressed the merits* of the defendant's Second Amendment challenge. *See Reese*, 627 F.3d at 800–04; *Schoendaller*, 2019 WL 2746695, at *2–5.

That's also what the Supreme Court did in the *Rahimi* case, which involved an almost identical fact pattern. *See* 602 U.S. at 690–702. Like Cole, Rahimi had been a respondent in a civil domestic abuse proceeding. *See id.* at 686. Also like Cole, Rahimi consented to the entry of a civil protective order. *See id.* at 687. Indeed, Rahimi expressly "AGREED TO AND APPROVED" the order, both "AS TO FORM AND CONTENT." Joint Appendix at 10, *Rahimi*, 602 U.S. 680 (No. 22–915), 2023 WL 5322443, at *10. And, like Cole, Rahimi was charged with a criminal statute that made it a felony for him to possess firearms while the protective order was in effect. *See* 602 U.S. at 688.

Yet, notwithstanding his express adoption of the civil protective order, Rahimi was still allowed to raise a Second Amendment challenge to the criminal statute. *See id.* at 693. And the merits of his Second Amendment challenge were thoroughly considered both by lower federal courts and the United States Supreme Court. *See id.* at 689–702.

Likewise, even though Cole consented to the entry of a civil protective order, Cole should be allowed to raise a Second Amendment challenge to the statute that criminalized his possession of firearms. And, like the Supreme Court in *Rahimi*, we should thoroughly consider the merits of Cole's Second Amendment challenge to that criminal statute. *See id.* at 690–702. Like cases should be treated alike.

### III. General Waiver Principles Show There Was No Waiver.

As the majority properly notes, however, the *Rahimi* opinion did not explicitly discuss the issue of waiver. But in other cases, the Supreme Court has provided an established body of principles that govern alleged waivers of

fundamental rights. Those principles preclude a finding that Cole waived his current Second Amendment challenge.[13]

"A waiver is . . . an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). When it comes to waivers of fundamental federal rights, the Supreme Court "has always set high standards of proof," which the government has the burden to satisfy. *Miranda v. Arizona,* 384 U.S. 436, 475 (1966). Courts must " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Zerbst,* 304 U.S. at 464 (quoting *Aetna Ins. v. Kennedy,* 301 U.S. 389, 393 (1937)). We cannot find a valid waiver unless the record shows that a waiver actually occurred and that it was voluntary, knowing, and intelligent. *See Montejo v. Louisiana,* 556 U.S. 778, 786 (2009).

When these principles are faithfully applied, they do not allow us to find a valid waiver here. They do not allow us to say that Cole's consent to a civil protective order somehow waived his right to raise future Second Amendment challenges in future criminal prosecutions like this one.

Let's start with the hearing itself, at which Cole's alleged waiver allegedly occurred. We have no transcript or other record from that hearing. We cannot say that there was any discussion during the hearing about (1) firearms, (2) the Second Amendment right to possess firearms, (3) future prosecutions for possessing firearms, or, most importantly, (4) possible Second Amendment challenges that Cole might raise in the event of a future prosecution. Certainly, we cannot say that those possible future challenges were a "known right or

---

[13]Although the State cites some cases to support its waiver theory, none of them involve criminal prosecutions, and none of them address federal law principles of waiver. *See Sims v. Rush,* No. 10–0237, 2010 WL 3503943, at *3 (Iowa Ct. App. Sept. 9, 2010); *In re Alatorre,* No. 01–0045, 2002 WL 576171, at *2 (Iowa Ct. App. Feb. 20, 2002); *Stewart v. Stewart,* 687 N.W.2d 116, 117 (Iowa Ct. App. 2004) (en banc).

privilege" that Cole was asked to waive or that Cole agreed to waive. *Zerbst*, 304 U.S. at 464. Nothing in the record shows that. And remember, we must "indulge every reasonable presumption *against* waiver" of fundamental rights, including Second Amendment rights. *Id.* (emphasis added) (quoting *Aetna Ins.*, 301 U.S. at 393).

It's true that Cole consented to the entry of the protective order. It's also true that the order mentioned Iowa Code section 724.26(2)(*a*) (2022) and its firearm prohibition. But there is an uncrossable gulf between (1) those facts and (2) the—incorrect—conclusion that Cole voluntarily, knowingly, and intelligently waived his rights to raise future constitutional challenges to section 724.26(2)(*a*).

To begin with, we do not know if Cole, who was proceeding pro se, even saw the order before it was entered. Nor do we know if Cole understood the order's contents after it was entered. In any event, the order said **nothing** about Cole giving up his right to mount constitutional challenges to section 724.26(2)(*a*) (or any other regulation) in the event of future criminal prosecution. Those future challenges weren't mentioned in the order.[14] So even if we were to assume that Cole understood and agreed to every single word of the protective order, we still couldn't find that Cole had waived his right to raise his current constitutional challenge.

### IV. *Class* Forecloses a Finding of Waiver.

The conclusion that no waiver occurred finds extra support in the Supreme Court's *Class* opinion. Indeed, if—as the Supreme Court found—there was no

---

[14]Because the protective-order court did not address Cole's future constitutional challenges to future criminal prosecutions, we would not have addressed those challenges if Cole had appealed the order, as the majority suggests he should have. Those issues wouldn't have been ripe. *See Singer v. City of Orange City*, 15 N.W.3d 70, 76 n.3 (Iowa 2024) (noting that as-applied challenges under Article I, section 8 "would not be ripe" where no warrant had been sought or issued and no inspections had occurred). Plus, the wrong parties would have been before us: While Cole's former girlfriend was the plaintiff in the protective order proceeding, the State would have to be the plaintiff in any criminal prosecution.

waiver under the facts of *Class*, it seems inconceivable that there was a waiver here.

Rodney Class's car contained firearms when he parked it on the United States Capitol grounds. *Class*, 583 U.S. at 176. Class was charged with violating a federal statute, 40 U.S.C. § 5104(e)(1), which prohibits the possession of firearms on Capitol grounds. *See id.* Class moved to dismiss the charge and claimed that the statute violates the Second Amendment. *Id.* The district court denied the motion. *Id.*

Class then entered a written plea agreement with the government. *Id.* The agreement covered various issues that Class was and was not waiving through his plea. *Id.* at 176–77. "The agreement said nothing about the right to raise on direct appeal a claim that the statute of conviction was unconstitutional." *Id.* at 177. The court "held a plea hearing during which it reviewed the terms of the plea agreement (with Class present and under oath) to ensure the validity of the plea." *Id.* "After providing Class with the required information and warnings," the court accepted the guilty plea and sentenced Class. *Id.*

On appeal, Class again raised his claim that the statute violated the Second Amendment. *Id.* at 177–78. But the D.C. Circuit Court of Appeals held that "Class could not raise his constitutional claims because, by pleading guilty, he had waived them." *Id.* at 177–78.

The Supreme Court disagreed. *Id.* at 178–85. In the Court's view, the simple act of pleading guilty did not automatically mean that Class relinquished his right to challenge the statute of conviction. *Id.* Moreover, the Court noted, Class's plea agreement did not expressly waive Class's right to pursue such a constitutional challenge. *Id.* at 184–85. And so, the Court held, no waiver had occurred. *Id.* at 185.

The same must be true of Cole. If pleading guilty to violating 40 U.S.C. § 5104(e)(1) didn't waive Class's right to challenge the constitutionality of 40 U.S.C. § 5104(e)(1) on appeal, surely Cole's consent to a protective order in a prior civil case couldn't have waived Cole's right to challenge the constitutionality of section 724.26(2)(*a*) in this criminal case. *See id.* This seems especially clear because Cole—like Class—never expressly waived his right to bring a constitutional challenge to any criminal statute in any criminal action. *See id.* at 184–85. Indeed, as already discussed, there's no reason to believe that such future constitutional challenges were even addressed in the protective order case, much less that Cole was asked to waive those challenges.

**V. The Majority's Waiver Cases Do Not Show Waiver Here.**

I appreciate the majority's efforts on this case. And I have respectfully considered the many waiver cases cited by the majority. None of them changes the outcome here. None of them involves facts like those before us, that is, a hearing in a civil case that allegedly led to a waiver of the right to raise a constitutional challenge in a future criminal case.

At first glance, it seems like the majority's most factually relevant cases might be those involving guilty pleas that were established or confirmed through in-court colloquies.[15] Those bear at least surface similarity to the situation of Cole, whose alleged waiver occurred during a court hearing. As just explained though, under *Class*, even a guilty plea with an in-court colloquy *does not* waive the defendant's right to raise constitutional challenges to the statute of conviction *unless* that particular right is *expressly* waived. This precludes a finding that Cole waived his right to bring a constitutional challenge in this case:

---

[15]*See United States v. Deng*, 104 F.4th 1052, 1054 (8th Cir. 2024) (concluding that the defendant waived his constitutional challenge on appeal by pleading guilty unconditionally); *People v. Johnson*, 206 N.Y.S.3d 584, 586–87 (App. Div. 2024) (concluding that the defendant waived his constitutional challenge on appeal by executing an appeal waiver).

Nothing in the record from the protective-order case suggests that Cole *expressly* waived his rights to raise a constitutional challenge in this or any future criminal case.

This points toward a broader problem with the majority's cases: Almost all of them involve situations in which a party's choices *in one particular case* have led a judge to conclude that the party waived certain rights *in that same case.* For instance, some of the majority's cases involve waivers of counsel within a particular case,[16] or speedy trial waivers within a particular case,[17] or waivers of other trial rights within a particular case,[18] or forfeiture of appeal rights within a particular case.[19] Two of them involve waivers of Second Amendment rights

---

[16]*See United States v. Stanley*, 891 F.3d 735, 738–39 (8th Cir. 2018) (concluding that the defendant waived his right to counsel); *State v. Miller*, 975 N.W.2d 807, 816–18 (Iowa 2022) (same).

[17]*State v. Magnuson*, 308 N.W.2d 83, 85–86 (Iowa 1981) (concluding that the defendant waived his right to a speedy trial); *see also State v. Johnson*, 770 N.W.2d 814, 822–23 (Iowa 2009) (noting that a "broad array of constitutional and statutory rights . . . may be waived" and concluding that the defendant waived his right to trial within the time limit imposed by the Interstate Agreement on Detainers).

[18]*United States v. Moon*, 33 F.4th 1284, 1298–300 (11th Cir. 2022) (concluding that the defendant waived his right to a public trial); *United States v. Garske*, 939 F.3d 321, 332 (1st Cir. 2019) (reversing the district court's dismissal and remanding for retrial because the defendants waiver of trial by a twelve-person jury could not "override the government's unwillingness to consent" to a trial by less than twelve); *United States v. Obak*, 884 F.3d 934, 937 (9th Cir. 2018) (concluding that the defendant waived "any objection as to a defect in venue" because he pleaded guilty, but addressing the merits because the government did not raise the waiver issue); *State v. Basquin*, 970 N.W.2d 643, 658–60 (Iowa 2022) (concluding that the defendant waived his right to a plea hearing in open court); *State v. Gomez Garcia*, 904 N.W.2d 172, 178–81 (Iowa 2017) (assuming without deciding that the defendant waived his statutory right to an interpreter at trial); *State v. Liddell*, 672 N.W.2d 805, 808–11, 813–14 (Iowa 2003) (rejecting, under the law in effect at the time, the defendant's claim that his counsel was ineffective for failing to ensure the defendant's jury trial waiver was knowing, voluntary, and intelligent where the court did not conduct an in-court colloquy but where the defendant "personally signed a written waiver of his right to a jury trial").

[19]*See United States v. Pittman*, 125 F.4th 527, 531 (4th Cir. 2025) (concluding that the defendant forfeited his constitutional challenge on appeal by failing to timely file a pretrial motion with the district court); *United States v. Turner*, 124 F.4th 69, 73, 75–78 (1st Cir. 2024) (same); *Al Bahlul v. United States*, 967 F.3d 858, 876 (D.C. Cir. 2020) (declining to reconsider a constitutional challenge that the defendant forfeited when the defendant refused to participate or present a substantive defense in the original military court proceedings); *State v. Kates*, 694 S.W.3d 462, 465 (Mo. Ct. App. 2024) (concluding that the defendant's constitutional challenges were "not preserved for review" when he raised them "for the first time on appeal").

within a particular case. For instance, in *State v. Maietta*, when the defendant agreed to give up firearm rights to get probation *in a particular criminal case*, he waived his right to raise the Second Amendment as a defense to revocation of his probation *in that same case.* 134 A.3d 572, 581 (Conn. 2016). Likewise, in *Roman v. State*, when the defendant agreed to give up firearm rights to obtain a community supervision arrangement *in a particular case*, he waived his right to raise the Second Amendment as a defense to the revocation of that arrangement *in that same case.* 571 S.W.3d 317, 321–23 (Tex. App. 2018).

So the majority's cases stand for the unremarkable principle that waivers within a particular case—call it Case 1—can lead to the loss of rights in the same case, Case 1. But none of the majority's cases show that a defendant's waiver of firearm rights *in one civil case* (Case 1) could prevent that defendant from raising a Second Amendment challenge in *Case 2, a separate criminal case* that may or may not be filed in the future. Indeed, there is apparently no authority for that proposition.[20] So even if we view Cole's consent to entry of the protective order as a waiver of the right to raise a Second Amendment challenge *within the protective order case* (Case 1), e.g., in response to a rule to show cause for violating the order, we still should not find a waiver of his right to raise a Second Amendment challenge in *this separate criminal case*, Case 2.

Because Cole did not waive his right to bring a Second Amendment challenge here, we should proceed to the merits of that challenge.

---

[20]As explained in part II, *Reese* and *Schoendaller* mentioned that a waiver in one case "arguably" could waive a challenge in a second case. *Reese*, 627 F.3d at 804 n.3; *Schoendaller*, 2019 WL 2746695, at *2. But neither of them actually found waiver. Both of them reached the merits instead. *Reese*, 627 F.3d at 800–04; *Schoendaller*, 2019 WL 2746695, at *2–5.

## VI. The Second Amendment Precludes Cole's Disarmament.

a.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. It provides individual citizens with a fundamental right to possess and use arms for private purposes, including self-defense. *Rahimi*, 602 U.S. at 690; *Bruen*, 597 U.S. at 17; *McDonald*, 561 U.S. at 767–68, 791; *District of Columbia v. Heller*, 554 U.S. 570, 599, 630 (2008). This fundamental right limits the power of the federal government to regulate the possession and use of firearms. And thanks to incorporation, the same limitations apply to state governments. *McDonald*, 561 U.S. at 791.

When an individual raises a Second Amendment challenge to a regulation, courts pursue a two-part inquiry. *Bruen*, 597 U.S. at 17. In the first part of the inquiry, courts ask whether "the Second Amendment's plain text covers" the regulated conduct. *Id.* If so, "the Constitution presumptively protects that conduct." *Id.*

In the second part of the inquiry, courts ask: Can the government carry its burden of "justify[ing] its regulation?" *Id.*; *see also Rahimi*, 602 U.S. at 691. To carry this burden, "the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. Instead, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, the government must show that the modern regulation "is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29).

To decide whether modern and historical regulations are "relevantly similar," courts must consider both "why" and "how" the regulations have

"burden[ed] the right" to bear arms. *Id.* This means that courts must consider (1) "whether modern and historical regulations impose a comparable burden" on the firearm right—the "how" of the regulations and (2) "whether that burden is comparably justified"—the "why" of the regulations. *Bruen,* 597 U.S. at 29.

b.

With these standards in mind, I now address Cole's as-applied challenge to section 724.26(2)(*a*). Under that section, "a person who is *subject to a protective order under 18 U.S.C. § 922(g)(8)* . . . and who knowingly possesses . . . a firearm . . . is guilty of a class 'D' felony." Iowa Code § 724.26(2)(*a*) (emphasis added). A "protective order under 18 U.S.C. § 922(g)(8)" means an order that would trigger that federal statute's firearms prohibition. *Id.* An order qualifies if it meets three requirements:

- First, the order must have been "issued after a hearing of which [the] person received actual notice, and at which [the] person had an opportunity to participate." 18 U.S.C. § 922(g)(8)(A).

- Second, the order must restrain the person "from harassing, stalking, or threatening" his or her "intimate partner" or his or her partner's child, or from "engaging in other conduct that would place" the partner "in reasonable fear of bodily injury to the partner or child." *Id.* § 922(g)(8)(B).

- Finally, under paragraph (C), the order must satisfy at least one of two criteria, which are set out in subparagraphs (C)(i) and (C)(ii). To satisfy (C)(i), the order must "include[] a finding that [the] person represents a credible threat to the physical safety of such intimate partner or child." *Id.* § 922(g)(8)(C)(i). To satisfy (C)(ii), the order must "by its terms explicitly prohibit[] the use, attempted use, or threatened use of

physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." *Id.* § 922(g)(8)(C)(ii).

As the majority correctly notes, Cole does not dispute that these statutory requirements are met. There's an important caveat, though, concerning paragraph (C). Cole concedes that because the protective order here prohibits certain uses of force, the order satisfies (C)(**ii**). Cole emphasizes, however, that the requirements of (C)(**i**) have not been separately met. They have not been separately met because the order included no finding that Cole represented a threat to anyone's safety. This fact is central to Cole's constitutional challenge.

c.

With that background out of the way, I return to the two-part inquiry. The first part of the inquiry is easy to resolve: There is no doubt that "the Second Amendment's plain text covers" the conduct regulated by section 724.26(2)(*a*). *Bruen*, 597 U.S. at 17; *see also Heller*, 554 U.S. at 592. Section 724.26(2)(*a*) prohibited Cole from *possessing firearms*, conduct that falls squarely within the Second Amendment's right to keep and bear arms. So Cole's conduct is presumptively protected by the Second Amendment. *See Bruen*, 597 U.S. at 17.

So now we turn to the second part of the inquiry: Can the State carry its burden of showing that section 724.26(2)(*a*) is relevantly similar to founding-era regulatory traditions? As explained, "relevantly similar" requires the State to show similarity *both* in "how" a historical analogue restricted the right *and* in "why" it restricted the right—the *justification* for the restriction. *Rahimi*, 602 U.S. at 692.

Here, the State proposes three historical analogues:

1. Founding-era statutes that disarmed whole groups of people who fell into certain racial, religious, political, or socioeconomic categories.

2. Founding-era surety laws, under which persons suspected of future misbehavior—including domestic abuse—could be required to post a bond before carrying arms.

3. Founding-era going armed laws, under which individuals who had menaced others with firearms could be punished.

We can eliminate the first proposed analogue, category-based statutes, from the outset. The State concedes that they are not adequately relevant because they disarmed people for different reasons—for a different "why"—than section 724.26(2)(*a*). While categorical restrictions disarmed people based on *categories* such as race or religious affiliation, section 724.26(2)(*a*) disarms people through "a case-by-case" approach that depends on *individual* circumstances such as the kind of hearing that was held, the kind of restrictions that were imposed in the resulting order, and so on.

So now we can consider the State's last two proposed analogues: surety laws and going armed laws. Those were the laws that the *Rahimi* Court relied upon to justify Mr. Rahimi's disarmament under § 922(g)(8). *Rahimi*, 602 U.S. at 695–97 (surety laws); *id.* at 697–98 (going armed laws). And, as explained, the criteria for disarmament under § 922(g)(8) are similar to those under Iowa Code section 724.26(2)(*a*). And so, the State argues, Cole's disarmament under Iowa Code section 724.26(2)(*a*) is justified by comparison with disarmaments under the surety and going armed laws.

I disagree. Here again, the "why" for the disarmament is dispositive. As the *Rahimi* Court made clear, surety laws and going armed laws allowed disarmament "to mitigate demonstrated threats of physical violence," 602 U.S. at 698, that were verified through "judicial determinations" that a particular individual posed a threat of danger to another's physical safety, *id.* at 699. Those were the "whys" for disarmament under those historical regimes. And those

"whys" were plainly applicable to Rahimi's case: He was disarmed through an order that "met the requirements" of paragraph (C)(i) "because it included *a finding* that Rahimi represented 'a credible threat to the physical safety' of" the girlfriend and her family. *Id.* at 689 (emphasis added).

But those "whys" do not apply to Cole. Unlike disarmament under surety laws and going armed laws, Cole was not disarmed because he posed a "*demonstrated* threat[] of physical violence." *Id.* at 698 (emphasis added). There was no evidence—and no stipulation—that Cole posed a threat to anyone's physical safety.[21] *See State v. Kieffer*, 17 N.W.3d 651, 664 (Iowa 2025) ("[T]he surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (quoting *Rahimi*, 602 U.S. at 698)).

Moreover—and, again, unlike with surety laws and going armed laws—Cole was not disarmed because of a "judicial determination[]" that he had threatened or would threaten anyone. *Rahimi*, 602 U.S. at 699. The court made no finding that Cole had been or would be abusive or violent. Although the court used a form order that included a box for the judge to check if Cole had committed a domestic abuse assault, the judge left that box *unchecked.* I see that as clear confirmation that the court *did not find* that Cole had engaged in domestic abuse. This makes sense because, so far as we can tell, there was no evidence to support such a finding.

---

[21]The State sometimes suggests that Cole's consent to the entry of the order was a kind of confession by Cole that he was dangerous and, therefore, the order "was necessary." This idea finds no support in the order or anywhere else in the record. It also overlooks the truth that people can consent to protective orders for any number of personal reasons—including a simple lack of interest in litigating. As Rahimi's counsel told the Supreme Court at oral argument, "in many cases, people are happy to consent to the orders because they don't want to be around the [protected] person anymore either." Transcript of Oral Argument at 70, *Rahimi*, 602 U.S. 680 (No. 22–915), 2023 WL 9375567, at *70.

In short, the justifications for disarmament under the surety and going armed laws—"the whys"—were demonstrations and judicial findings that the disarmed individual posed a substantial threat of physical violence. Those "whys" are wholly absent from Cole's case. There was no demonstration, and there was no judicial finding, that Cole posed a threat of violence to anyone. So the surety and going armed laws are not "relevantly similar," they cannot justify Cole's disarmament, and Cole's convictions violate the Second Amendment. *See United States v. Van Dyke*, No. 4:23–cr–00193, 2024 WL 1514129, at *1, *6–10 (D. Idaho Apr. 8, 2024) (dismissing on Second Amendment grounds an indictment under § 922(g)(8)(C)(ii) because the underlying no-contact order had been entered based on a defendant's consent and without any individualized "determination of dangerousness"), *appeal filed*, No. 24–2861 (9th Cir. May 6, 2024);[22] George A. Mocsary, *In Denial About the Obvious: Upending the Rhetoric of the Modern Second Amendment*, 2024 Cato Sup. Ct. Rev. 201, 211 (arguing that § 922(g)(8)(C)(ii) is constitutionally unfirm); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1507 (2009) (questioning whether the Second Amendment can permit disarmament of "people simply because they're subject to a court order that has been entered with no finding of past violence or future dangerousness," as § 922(g)(8)(C)(ii) authorizes); Nelson Lund, *The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders*, 4 Tex. Rev. L. & Pol. 157, 189 (1999) (suggesting that § 922(g)(8)(C)(ii) violates the Second Amendment insofar as it "impose[s] a firearms disability on citizens who have never been convicted of a

---

[22] *Van Dyke* is set for oral argument before the Ninth Circuit Court of Appeals on July 9, 2025. *Oral Argument Dates & Locations*, U.S. Ct. of Appeals for the Ninth Cir., https://www.ca9.uscourts.gov/calendar/ (enter "24-2861" for the "Case Number" and click "Search Case Numbers").

crime and who have never been shown to be any more dangerous than anyone else"); Brief of Amici Curiae Professors of Second Amendment Law, the Second Amendment Law Center, and the Independence Institute in Support of Respondent and Affirmance at 29, *Rahimi*, 602 U.S. 680 (No. 22–915), 2023 WL 6622951, at *29 (arguing that although § 922(g)(8)(C)(i) is permissible under the Second Amendment because it "requires a judicial finding of dangerousness," § 922(g)(8)(C)(ii) "is an infringement" because it "does not require such a finding," and noting that "[j]udicial orders that acrimonious domestic parties not do something illegal in the future is not equivalent to a judicial finding that there is 'a credible threat' of illegal behavior").

## VII. An Implied-Finding Theory Should Not Prevail Here.

I have considered the State's implied-finding theory. This is the idea that although the protective order contains no finding that Cole presents a threat to anyone, and although the record contains no evidence that would have supported such a finding, we should nonetheless *infer* such a finding from the mere fact that a protective order was issued. Respectfully, I do not believe such reasoning can justify Cole's disarmament.

I recognize that some courts have used implied-finding rationales to uphold disarmament under § 922(g)(8)(C)(ii). Since *Rahimi*, three federal circuit courts of appeals—the Fifth, the Sixth, and the Tenth—have done so. And although we are not bound by federal circuit courts' interpretations of federal law, we should give these circuit court decisions respectful consideration. *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 460 (Iowa 2000) (en banc).

All three courts started with a correct assumption: under *Rahimi*, a protective order cannot serve as a constitutional basis for disarmament unless the issuing court has made a judicial determination that the person "poses a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698; *see United*

*States v. Gordon,* 137 F.4th 1153, 1156 (10th Cir. 2025); *United States v. Perez-Gallan,* 125 F.4th 204, 215 (5th Cir. 2024); *United States v. Combs*, No. 23–5121, 2024 WL 4512533, at *3 (6th Cir. Oct. 17, 2024). The real question, then, was whether that judicial-determination requirement could be fulfilled when the protective order did not mention such a judicial determination. The circuit courts believed that it could be. They believed that in the states where the relevant orders had been issued, an order should not have been issued unless a judge found that the respondent posed a risk of physical harm to the protected party. Therefore, the courts reasoned, the very issuance of the order could imply an unspoken finding that the respondent posed such a threat. *Gordon,* 137 F.4th at 1157–58; *Perez-Gallan,* 125 F.4th at 215–16; *Combs,* 2024 WL 4512533, at *2–3.

Respectfully, I do not believe these opinions should lead us to reject Cole's as-applied challenge. To begin with, it is important that in all three cases, the courts rejected only *facial* challenges to § 922(g)(8)(C)(ii). *Gordon,* 137 F.4th at 1154; *Perez-Gallan,* 125 F.4th at 209; *Combs,* 2024 WL 4512533, at *1. None of the courts foreclosed the possibility of successful as-applied challenges to § 922(g)(8)(C)(ii) or, in Cole's case, a state analogue. Indeed, two of the courts—the Tenth and Fifth Circuit Courts—hinted that as-applied challenges could be successful. Although skeptical, the Tenth Circuit acknowledged that "[p]erhaps there could be a domestic-violence protective order in Utah that satisfied (C)(ii) but was not based on implicit findings" that the respondent threatened physical violence to the protected party. *Gordon,* 137 F.4th at 1158. An order of that sort wouldn't satisfy *Rahimi. Cf. Van Dyke,* 2024 WL 1514129, at *9–10 (rejecting an implied-finding theory based on Idaho state law and dismissing as unconstitutional a § 922(g)(8)(C)(ii) indictment).

The Fifth Circuit went much further. The court acknowledged that "some potential applications of § 922(g)-(8)(C)(ii) appear problematic." *Perez-Gallan*, 125 F.4th at 216. And the court specifically declined to hold "that the statute is (or even likely to be) constitutional in *all* its applications." *Id.* As an illustration, the court noted that sometimes judges issue "mutual" protective orders—protective orders against both parties—for the (wholly understandable) purpose of assuring that the parties stay apart from each other. *Id.*; *see United States v. Rahimi*, 61 F.4th 443, 466–67 (5th Cir. 2023) (Ho, J., concurring), *rev'd*, 602 U.S. 680 (2024). These mutual protective orders may be issued even when only one party is the abuser and "even if there are no indications that the [victim] is dangerous." *Perez-Gallan*, 125 F.4th at 216. This could lead to a "profoundly perverse" outcome where a nondangerous victim is deprived of her right to keep and bear arms because of a protective order against her. *Id.* (quoting *Rahimi*, 61 F.4th at 466 (Ho, J., concurring)). Indeed, as Judge Ho has emphasized, that victim could be *sent to prison* simply because she armed herself. *United States v. Rahimi*, 117 F.4th 331, 335 (5th Cir. 2024) (per curiam) (Ho, J., concurring); *Rahimi*, 61 F.4th at 466–67 (Ho, J., concurring).

In any event, there are at least three reasons why an implied-finding theory should not foreclose Cole's as-applied challenge. First, as a general matter, we can take judicial notice that when parties are willing to consent to a protective order, Iowa judges will often enter the order without further inquiry into whether actual abuse has occurred. This practice is now codified in Iowa Code section 236.5(2), which states that "[t]he court may approve a consent agreement which may contain" all of the provisions that are otherwise available in protective orders "*without a finding* the defendant has engaged in domestic abuse." Iowa Code § 236.5(2) (2025) (emphasis added). This approach is, of course, plainly

contrary to the notion that entry of a protective order implies a finding that the restrained party has engaged in domestic abuse.

I acknowledge that the "without a finding" language was added to the Code in 2022 and became effective July 1, 2022, just months after Cole's order was entered. 2022 Iowa Acts ch. 1042, § 2 (codified at Iowa Code § 236.5(2) (2023)). Again, though, we can take judicial notice that this amendment really just conformed the Code's text to preexisting practice among our judges. *See, e.g.,* *Hardy-Wilson v. Hadaway,* No. 21–0336, 2021 WL 5475585, at *1 (Iowa Ct. App. Nov. 23, 2021) ("Following an unreported hearing, the district court filed a protective order by consent agreement without a finding of domestic abuse."); *Hobbs v. Iowa Dist. Ct.,* Nos. 06–0182, 7–058, 2007 WL 601765, at *2 (Iowa Ct. App. Feb. 28, 2007) (interpreting Iowa Code section 236.5 (2005) to "provide[] that a court may (1) grant a protection order upon a finding that the defendant has engaged in domestic abuse or (2) grant a consent order based upon a consent agreement between the parties"); *In re Marriage of Stark,* Nos. 0–095, 99–614, 2000 WL 328079, at *1 (Iowa Ct. App. Mar. 29, 2000) ("The court entered a protective order by consent agreement, conditioned on no finding of domestic abuse against [the respondent]."). *But see, e.g., Wendt v. Mead,* No. 16-0928, 2017 WL 510972, at *2 (Iowa Ct. App. Feb. 8, 2017) (noting that a protective order was defective because it was not predicated on a finding of domestic abuse).

Indeed, we have sometimes encouraged this practice through our own "New Judges School." We have trained new judges that near the beginning of a protective order hearing, the judge should give the defendant three choices: (1) continue the hearing so they can obtain an attorney (assuming they didn't show up with one); (2) go straight to an evidentiary hearing, during which both sides will testify and then the court will decide whether the defendant committed

abuse; or (3) agree to a consent order, which does not require a finding of abuse. Many people choose the third option—as did Cole and "Julie," the pseudonym we are using for the petitioner/protected party in the protective order case. And because they made that choice, the court had no reason to make a finding as to whether abuse had occurred.

This brings me to the second reason to reject an implied-finding-of-abuse theory: the protective order itself, which illustrates the practice that I just described. Because Julie and Cole consented to the entry of an order, the judge did not make a finding about whether domestic abuse had occurred. This is made clear through the empty check box discussed before. Here's a reproduction of the order, including the unchecked box, "(3)":

E-FILED          DACV029900 - 2022 MAR 07 11:26 AM          HAMILTON
                 CLERK OF DISTRICT COURT                   Page 2 of 4

(1) Respondent was personally served with a copy of the petition and the temporary protective order containing notice of this hearing.

(2) The parties appeared and each consented to the entry of this order

☐(3) If checked, the respondent committed a domestic abuse assault against the protected party.

Again, if the judge had found that Cole "committed a domestic abuse assault" against Julie, the box next to "(3)" would have been checked. But that box was not checked. This makes it plain that the judge *did not find* that Cole committed domestic abuse. We should not ignore this plain reality. We should not infer that there *was* a finding when it's plain that there *was not* a finding.

Finally, consider the empty record. Our only record from the protective order proceeding is the order itself. We have no transcript or other evidence. And we have no other reason to think that the court heard any testimony or received any exhibits. Certainly, we have no reason to think that the court heard evidence that Cole posed a credible threat to anyone's physical safety. And I can't assume an Iowa judge would find such a threat without supporting evidence.

In short, based on all we know—including the empty record, the unchecked box on the order, and the known traditions of our courts—an implied-finding theory simply does not fit the situation before us. We should reject that theory, at least for purposes of Cole's case.[23]

## VIII. The Majority's Points About the Record.

### a.

The majority suggests that the record may be broader than I've explained. In particular, the majority mentions the petition that Julie filed to commence the chapter 236 action. And the majority invites us to imagine the petition's contents—that it "had to have" included an "alleg[ation]" of assault by Cole.

But I think we should keep two other things in mind. First, although this probably goes without saying, no matter what allegations were contained in the petition, mere *allegations* could never fulfill *Rahimi*'s requirement of a judicial *finding* that Cole presented a credible threat to Julie's person. If mere allegations were enough to justify the disarmament of a citizen, *Rahimi*'s requirements would be largely meaningless, as would the Second Amendment.

Second, we should remember that the petition is not in our record. So we do not know what it actually said. Nor should we make assumptions about a petition that we have not seen. Of course, we know that many protective order actions are filed for good and sufficient reasons, including terrible acts of domestic violence. But we know that some are not. Some actions are initiated for

---

[23]The State's brief sometimes suggests that the protective order's prohibition of "further" acts of abuse should be read to imply the existence of prior acts of abuse. For the reasons explained above, I do not think that such prior acts were proven or found as to Cole. Also, the "further" acts language appears to be an artifact of our process in Iowa. We require our judges to use branch-mandated templates when entering protective orders under Iowa Code chapter 236. Iowa Ct. R. 4.200. The "further" acts of violence language is built into some of those templates. *See* Iowa Ct. R. Form 4.3: *Protective Order by Consent Agreement (Section 236.3 Petition)* (2021). It appears that the language was built into the template that was used by the judge here. It does not appear that the language was something that the judge could have added or erased.

insufficient reasons, such as ordinary disagreements that don't involve actual or threatened violence. And sometimes an *abuser* will pursue a protective order action *against a victim* for abusive reasons, such as "to further isolate, intimidate, and control" the victim,[24] and for tactical reasons, such as "confus[ing] the court as to who the perpetrator is and who the victim is."[25]

Bottom line: Just because one person has requested a protective order against a second person, we cannot just assume that the second person is a violent abuser. Rather, we must demand a finding of violent abuse made by a judge who has heard evidence of violent abuse. Here, there was neither evidence nor a finding.

b.

The majority opinion also repeatedly mentions the unproven, now-dismissed theft charge against Cole. These repeated mentions, especially

[24]King Cnty. Coal. Against Domestic Violence, *When Survivors Are Served: An FAQ for Advocates Working with Survivors Who Have Been Served with a Domestic Violence Protection Order in King County* 2, 10 (2015), https://endgv.org/wp-content/uploads/2016/04/When-Survivors-Are-Served-FAQ-.pdf [https://perma.cc/R8AD-GVL3] ("Unfortunately, abusive people sometimes file for a domestic violence protection order in an attempt to further isolate, intimidate, and control their intimate partner."); *see, e.g.*, Ellen R. Gutowski & Lisa A. Goodman, *Coercive Control in the Courtroom: The Legal Abuse Scale (LAS)*, 38 J. Fam. Violence 527, 527, 539 (2023) (listing potential items of legal abuse after consulting with "23 experts, qualitative interviews, and existing literature" and including on the list whether the abusive parent threatened to (or actually did) take out a restraining order against the victim of abuse); David H. Taylor et al., *Ex Parte Domestic Violence Orders of Protection: How Easing Access to Judicial Process Has Eased the Possibility for Abuse of the Process*, 18 Kan. J. L. & Pub. Pol'y 83, 87 (2008) ("The abuser can use an order of protection as another means of abuse."); Mass. L. Reform Inst., *What If the Person Who Abused Me Files a Restraining Order or Criminal Case Against Me?*, Mass Legal Help (Feb. 2025), https://www.masslegalhelp.org/domestic-abuse-crime-victims/209a-restraining-orders/what-if-person-who-abused-me-files-restraining [https://perma.cc/FJ7S-YP7U] ("Sometimes abusive people try to use the police and the courts against the people they abuse. They might try to get a restraining order or press criminal charges against the people they abuse.").

[25]Patricia Fersch, *Domestic Violence in the Courtroom: The Legal System as a Weapon in Domestic Violence Cases*, Forbes (Sept. 1, 2022), https://www.forbes.com/sites/patriciafersch/2022/09/01/domestic-violence-in-the-courtroom-the-legal-system-as-a-weapon-in-domestic-violence-cases/ [https://perma.cc/A4VN-XCYP].

those at the very start of the opinion, seem to imply that the charge is very important to the issues before us. But the majority does not explain why.

In any event, we should not permit the theft charge to distract us or cause us to slide into faulty thinking. We should not entertain the faulty notion that because Cole was charged with the crime of theft, he is now a constitutional nobody whose rights aren't worthy of consideration. Instead, we should embrace the bedrock principle of justice that people are presumed innocent until proven guilty beyond a reasonable doubt. And Cole was never proven guilty of the theft charge, which has now been dismissed. So that charge should carry no weight in our analysis of his fundamental constitutional rights.

c.

Because the record does not establish—and because a judge did not find—that Cole presented a threat of violence to anyone, the Second Amendment precluded Cole's disarmament. Cole's possession of firearms should not have been grounds for felony convictions. We should vacate those convictions and reverse for dismissal.

### IX. The Very Important Issue of Safety.

a.

Before concluding, I must discuss the state's very legitimate interest in disarming violent abusers. I applaud the concurrence for highlighting this very important issue.

Even so, our court's analysis of Second Amendment issues is dictated by the Supreme Court's precedents. We must follow those precedents "whether we agree with them or not," *Rahimi*, 117 F.4th at 334 (Ho, J., concurring), and whether they conflict with important policy interests or not.

Here, though, I see no conflict. Under *Rahimi*, the state may disarm "individual[s] found by a court to pose a credible threat to the physical safety of

another." 602 U.S. at 702. This lines up well with the state's legitimate safety interest in disarming violent abusers. It also lines up well with the proper result in this case: because Cole has *not* been "found by a court to pose a credible threat to the physical safety of another," there is no public-safety basis for his disarmament. *Id.*

b.

One last thought on the safety issue. Although civil protective orders can play an important role in disarming violent abusers, they are not the only answer. Judge Ho has written about this topic at least twice now. *Rahimi,* 117 F.4th at 335 (Ho, J., concurring); *Rahimi,* 61 F.4th at 463–64 (Ho, J., concurring). As he properly notes, the criminal justice system provides the traditional mechanism through which "[v]iolent criminals" can be "disarmed, detained, prosecuted, convicted, and incarcerated." *Rahimi,* 117 F.4th at 335 (Ho, J., concurring); *see Rahimi,* 61 F.4th at 463–64 (Ho, J., concurring). Indeed, within Iowa Code chapter 236 itself, our legislature specifically reminds the state that "in addition to the provisions contained in this chapter," there are additional provisions "pertaining to domestic abuse assaults," including criminal sanctions for those who are proven guilty of such assaults. Iowa Code § 236.18. Those criminal statutes provide the state with powerful tools to pursue its legitimate interests in disarming violent abusers.

But because the State didn't charge Cole with violating any of those domestic abuse statutes—or, indeed, with committing any crime of violence—we need not discuss those matters further.

## X. Conclusion.

For the reasons explained above, I would reverse and remand for dismissal of Cole's convictions. I respectfully dissent.

Oxley and McDermott, JJ., join this dissent.